ALLSTATE INSURANCE CO. *v.* HAGUE, PERSONAL
REPRESENTATIVE OF HAGUE'S ESTATE

No. 79–938.   Argued October 6, 1980—Decided January 13, 1981

BRENNAN, J., announced the judgment of the Court and delivered an opinion, in which WHITE, MARSHALL, and BLACKMUN, JJ., joined. STEVENS, J., filed an opinion concurring in the judgment, *post,* p. 320. POWELL, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST, J., joined, *post,* p. 332. STEWART, J., took no part in the consideration or decision of the case.

*Mark M. Nolan* argued the cause and filed a brief for petitioner.

*Andreas F. Lowenfeld* argued the cause for respondent. With him on the brief were *Samuel H. Hertogs* and *Bruce J. Douglas.*

JUSTICE BRENNAN announced the judgment of the Court and delivered an opinion, in which JUSTICE WHITE, JUSTICE MARSHALL, and JUSTICE BLACKMUN joined.

This Court granted certiorari to determine whether the Due Process Clause of the Fourteenth Amendment [1] or the Full Faith and Credit Clause of Art. IV, § 1,[2] of the United States Constitution bars the Minnesota Supreme Court's choice of substantive Minnesota law to govern the effect of a provision in an insurance policy issued to respondent's decedent. 444 U. S. 1070 (1980).

---

[1] The Due Process Clause of the Fourteenth Amendment provides that no State "shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."

[2] The Full Faith and Credit Clause, Art. IV, § 1, provides:

"Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records, and Proceedings shall be proved, and the Effect thereof."

# I

Respondent's late husband, Ralph Hague, died of injuries suffered when a motorcycle on which he was a passenger was struck from behind by an automobile. The accident occurred in Pierce County, Wis., which is immediately across the Minnesota border from Red Wing, Minn. The operators of both vehicles were Wisconsin residents, as was the decedent, who, at the time of the accident, resided with respondent in Hager City, Wis., which is one and one-half miles from Red Wing. Mr. Hague had been employed in Red Wing for the 15 years immediately preceding his death and had commuted daily from Wisconsin to his place of employment.

Neither the operator of the motorcycle nor the operator of the automobile carried valid insurance. However, the decedent held a policy issued by petitioner Allstate Insurance Co. covering three automobiles owned by him and containing an uninsured motorist clause insuring him against loss incurred from accidents with uninsured motorists. The uninsured motorist coverage was limited to $15,000 for each automobile.[3]

After the accident, but prior to the initiation of this lawsuit, respondent moved to Red Wing. Subsequently, she married a Minnesota resident and established residence with her new husband in Savage, Minn. At approximately the same time, a Minnesota Registrar of Probate appointed respondent personal representative of her deceased husband's estate. Following her appointment, she brought this action in Minnesota District Court seeking a declaration under Minnesota law that the $15,000 uninsured motorist coverage on each of her late husband's three automobiles could be "stacked" to provide total coverage of $45,000. Petitioner defended on the ground that whether the three uninsured motorist

---

[3] Ralph Hague paid a separate premium for each automobile including an additional separate premium for each uninsured motorist coverage.

coverages could be stacked should be determined by Wisconsin law, since the insurance policy was delivered in Wisconsin, the accident occurred in Wisconsin, and all persons involved were Wisconsin residents at the time of the accident.

The Minnesota District Court disagreed. Interpreting Wisconsin law to disallow stacking, the court concluded that Minnesota's choice-of-law rules required the application of Minnesota law permitting stacking. The court refused to apply Wisconsin law as "inimical to the public policy of Minnesota" and granted summary judgment for respondent.[4]

The Minnesota Supreme Court, sitting en banc, affirmed the District Court.[5] The court, also interpreting Wisconsin law to prohibit stacking,[6] applied Minnesota law after analyzing the relevant Minnesota contacts and interests within the analytical framework developed by Professor Leflar.[7] See Leflar, Choice-Influencing Considerations in Conflicts Law, 41 N. Y. U. L. Rev. 267 (1966). The state court, therefore, examined the conflict-of-laws issue in terms of (1) predictability of result, (2) maintenance of interstate order, (3) simplification of the judicial task, (4) advancement of the forum's governmental interests, and (5) application of the better rule of law. Although stating that the Minnesota contacts might not be, "in themselves, sufficient to mandate application of [Minnesota] law," [8] 289 N. W. 2d 43, 49

---

[4] App. C to Pet. for Cert. A–29.

[5] 289 N. W. 2d 43 (1978).

[6] Respondent has suggested that this case presents a "false conflict." The court below rejected this contention and applied Minnesota law. Even though the Minnesota Supreme Court's choice of Minnesota law followed a discussion of whether this case presents a false conflict, the fact is that the court chose to apply Minnesota law. Thus, the only question before this Court is whether that choice was constitutional.

[7] Minnesota had previously adopted the conceptual model developed by Professor Leflar in *Milkovich* v. *Saari*, 295 Minn. 155, 203 N. W. 2d 408 (1973).

[8] The court apparently was referring to sufficiency as a matter of choice

(1978), under the first four factors, the court concluded that the fifth factor—application of the better rule of law—favored selection of Minnesota law. The court emphasized that a majority of States allow stacking and that legal decisions allowing stacking "are fairly recent and well considered in light of current uses of automobiles." *Ibid.* In addition, the court found the Minnesota rule superior to Wisconsin's "because it requires the cost of accidents with uninsured motorists to be spread more broadly through insurance premiums than does the Wisconsin rule." *Ibid.* Finally, after rehearing en banc,[9] the court buttressed its initial opinion by indicating "that contracts of insurance on motor vehicles are in a class by themselves" since an insurance company "knows the automobile is a movable item which will be driven from state to state." 289 N. W. 2d, at 50 (1979). From this premise the court concluded that application of Minnesota law was "not so arbitrary and unreasonable as to violate due process." *Ibid.*

## II

It is not for this Court to say whether the choice-of-law analysis suggested by Professor Leflar is to be preferred or whether we would make the same choice-of-law decision if sitting as the Minnesota Supreme Court. Our sole function is to determine whether the Minnesota Supreme Court's choice of its own substantive law in this case exceeded federal constitutional limitations. Implicit in this inquiry is the recognition, long accepted by this Court, that a set of facts giving rise to a lawsuit, or a particular issue within a lawsuit, may justify, in constitutional terms, application of the law of more than one jurisdiction. See, *e. g., Watson* v. *Employers Liability Assurance Corp.,* 348 U. S. 66, 72–73 (1954); n. 11, *infra.* See generally *Clay* v. *Sun Insurance Office, Ltd.,* 377 U. S.

---

of law and not as a matter of constitutional limitation on its choice-of-law decision.

[9] 289 N. W. 2d, at 50 (1979).

179, 181–182 (1964) (hereinafter cited as *Clay II*). As a result, the forum State may have to select one law from among the laws of several jurisdictions having some contact with the controversy.

In deciding constitutional choice-of-law questions, whether under the Due Process Clause or the Full Faith and Credit Clause,[10] this Court has traditionally examined the contacts of the State, whose law was applied, with the parties and with the occurrence or transaction giving rise to the litigation. See *Clay II, supra,* at 183. In order to ensure that the choice of law is neither arbitrary nor fundamentally unfair, see *Alaska Packers Assn.* v. *Industrial Accident Comm'n,* 294 U. S. 532, 542 (1935), the Court has invalidated the choice of law of a State which has had no significant contact or significant aggregation of contacts, creating state interests, with the parties and the occurrence or transaction.[11]

---

[10] This Court has taken a similar approach in deciding choice-of-law cases under both the Due Process Clause and the Full Faith and Credit Clause. In each instance, the Court has examined the relevant contacts and resulting interests of the State whose law was applied. See, *e. g., Nevada* v. *Hall,* 440 U. S. 410, 424 (1979). Although at one time the Court required a more exacting standard under the Full Faith and Credit Clause than under the Due Process Clause for evaluating the constitutionality of choice-of-law decisions, see *Alaska Packers Assn.* v. *Industrial Accident Comm'n,* 294 U. S. 532, 549–550 (1935) (interest of State whose law was applied was no less than interest of State whose law was rejected), the Court has since abandoned the weighing-of-interests requirement. *Carroll* v. *Lanza,* 349 U. S. 408 (1955); see *Nevada* v. *Hall, supra;* Weintraub, Due Process and Full Faith and Credit Limitations on a State's Choice of Law, 44 Iowa L. Rev. 449 (1959). Different considerations are of course at issue when full faith and credit is to be accorded to acts, records, and proceedings outside the choice-of-law area, such as in the case of sister state-court judgments.

[11] Prior to the advent of interest analysis in the state courts as the "dominant mode of analysis in modern choice of law theory," Silberman, *Shaffer* v. *Heitner:* The End of an Era, 53 N. Y. U. L. Rev. 33, 80, n. 259 (1978); cf. *Richards* v. *United States,* 369 U. S. 1, 11–13, and nn. 26–27 (1962) (discussing trend toward interest analysis in state courts), the prevailing choice-of-law methodology focused on the jurisdiction where a par-

Two instructive examples of such invalidation are *Home Ins. Co. v. Dick,* 281 U. S. 397 (1930), and *John Hancock Mutual Life Ins. Co. v. Yates,* 299 U. S. 178 (1936). In both cases, the selection of forum law rested exclusively on the presence of one nonsignificant forum contact.

*Home Ins. Co. v. Dick* involved interpretation of an insurance policy which had been issued in Mexico, by a Mexican insurer, to a Mexican citizen, covering a Mexican risk. The policy was subsequently assigned to Mr. Dick, who was domiciled in Mexico and "physically present and acting in Mexico," 281 U. S., at 408, although he remained a nominal, permanent resident of Texas. The policy restricted coverage to losses occurring in certain Mexican waters and, indeed, the loss occurred in those waters. Dick brought suit

ticular event occurred. See, *e. g.,* Restatement of Conflict of Laws (1934). For example, in cases characterized as contract cases, the law of the place of contracting controlled the determination of such issues as capacity, fraud, consideration, duty, performance, and the like. *Id.,* § 332; see Beale, What Law Governs the Validity of a Contract, 23 Harv. L. Rev. 260, 270–271 (1910). In the tort context, the law of the place of the wrong usually governed traditional choice-of-law analysis. Restatement, *supra,* § 378; see *Richards* v. *United States, supra,* at 11–12.

*Hartford Accident & Indemnity Co.* v. *Delta & Pine Land Co.,* 292 U. S. 143 (1934), can, perhaps, best be explained as an example of that period. In that case, the Court struck down application by the Mississippi courts of Mississippi law which voided the limitations provision in a fidelity bond written in Tennessee between a Connecticut insurer and Delta, both of which were doing business in Tennessee and Mississippi. By its terms, the bond covered misapplication of funds "by any employee 'in any position, anywhere . . . .'" *Id.,* at 145. After Delta discovered defalcations by one of its Mississippi-based employees, a lawsuit was commenced in Mississippi.

That case, however, has scant relevance for today. It implied a choice-of-law analysis which, for all intents and purposes, gave an isolated event—the writing of the bond in Tennessee—controlling constitutional significance, even though there might have been contacts with another State (there Mississippi) which would make application of its law neither unfair nor unexpected. See Martin, Personal Jurisdiction and Choice of Law, 78 Mich. L. Rev. 872, 874, and n. 11 (1980).

in Texas against a New York reinsurer. Neither the Mexican insurer nor the New York reinsurer had any connection to Texas.[12] The Court held that application of Texas law to void the insurance contract's limitation-of-actions clause violated due process.[13]

The relationship of the forum State to the parties and the transaction was similarly attenuated in *John Hancock Mutual Life Ins. Co.* v. *Yates.* There, the insurer, a Massachusetts corporation, issued a contract of insurance on the life of a New York resident. The contract was applied for, issued, and delivered in New York where the insured and his spouse resided. After the insured died in New York, his spouse moved to Georgia and brought suit on the policy in Georgia. Under Georgia law, the jury was permitted to take into account oral modifications when deciding whether an insurance policy application contained material misrepresentations. Under New York law, however, such misrepresentations were to be evaluated solely on the basis of the written application. The Georgia court applied Georgia law. This Court reversed, finding application of Georgia law to be unconstitutional.

*Dick* and *Yates* stand for the proposition that if a State has only an insignificant contact with the parties and the

---

[12] Dick sought to obtain *quasi-in-rem* jurisdiction by garnishing the reinsurance obligation of the New York reinsurer. The reinsurer had never transacted business in Texas, but it "was cited by publication, in accordance with a Texas statute; attorneys were appointed for it by the trial court; and they filed on its behalf an answer which denied liability." 281 U. S., at 402. There would be no jurisdiction in the Texas courts to entertain such a lawsuit today. See *Rush* v. *Savchuk*, 444 U. S. 320 (1980); *Shaffer* v. *Heitner*, 433 U. S. 186 (1977); Silberman, *supra*, at 62–65.

[13] The Court noted that the result might have been different if there had been some connection to Texas upon "which the State could properly lay hold as the basis of the regulations there imposed." 281 U. S., at 408, n. 5; see *Watson* v. *Employers Liability Assurance Corp.*, 348 U. S. 66, 71 (1954).

occurrence or transaction, application of its law is unconstitutional.[14]  *Dick* concluded that nominal residence—standing alone—was inadequate; *Yates* held that a postoccurrence change of residence to the forum State—standing alone—was insufficient to justify application of forum law.  Although instructive as extreme examples of selection of forum law, neither *Dick* nor *Yates* governs this case.  For in contrast to those decisions, here the Minnesota contacts with the parties and the occurrence are obviously significant.  Thus, this case is like *Alaska Packers, Cardillo* v. *Liberty Mutual Ins. Co.,* 330 U. S. 469 (1947), and *Clay II*—cases where this Court sustained choice-of-law decisions based on the contacts of the State, whose law was applied, with the parties and occurrence.

In *Alaska Packers,* the Court upheld California's application of its Workmen's Compensation Act, where the most significant contact of the worker with California was his execution of an employment contract in California.  The worker, a nonresident alien from Mexico, was hired in California for seasonal work in a salmon canning factory in Alaska.  As part of the employment contract, the employer, who was doing business in California, agreed to transport the worker to Alaska and to return him to California when the work was completed.  Even though the employee contracted to be bound by the Alaska Workmen's Compensation Law and was injured in Alaska, he sought an award under the California Workmen's Compensation Act.  The Court held that the choice of California law was not "so arbitrary or unreasonable as to amount to a denial of due process," 294 U. S., at 542, because "[w]ithout a remedy in California, [he] would be remediless," *ibid.,* and because of California's interest that the worker not become a public charge, *ibid.*[15]

---

[14] See generally, Weintraub, *supra* n. 10, at 455–457.

[15] The Court found no violation of the Full Faith and Credit Clause, since California's interest was considered to be no less than Alaska's, 294

In *Cardillo* v. *Liberty Mutual Ins. Co., supra,* a District of Columbia resident, employed by a District of Columbia employer and assigned by the employer for the three years prior to his death to work in Virginia, was killed in an automobile crash in Virginia in the course of his daily commute home from work. The Court found the District's contacts with the parties and the occurrence sufficient to satisfy constitutional requirements, based on the employee's residence in the District, his commute between home and the Virginia workplace, and his status as an employee of a company "engaged in electrical construction work in the District of Columbia and surrounding areas." *Id.,* at 471.[16]

Similarly, *Clay II* upheld the constitutionality of the application of forum law. There, a policy of insurance had issued in Illinois to an Illinois resident. Subsequently the insured moved to Florida and suffered a property loss in Florida. Relying explicitly on the nationwide coverage of the policy and the presence of the insurance company in Florida and implicitly on the plaintiff's Florida residence and the occurrence of the property loss in Florida, the Court sustained the Florida court's choice of Florida law.

The lesson from *Dick* and *Yates,* which found insufficient forum contacts to apply forum law, and from *Alaska Packers, Cardillo,* and *Clay II,* which found adequate contacts to sustain the choice of forum law,[17] is that for a State's substan-

U. S., at 547–548, 549–550, even though the injury occurred in Alaska while the employee was performing his contract obligations there. While *Alaska Packers* balanced the interests of California and Alaska to determine the full faith and credit issue, such balancing is no longer required. See *Nevada* v. *Hall,* 440 U. S., at 424; n. 10, *supra.*

[16] The precise question raised was whether the Virginia Compensation Commission "had sole jurisdiction over the claim." 330 U. S., at 472–473. In finding that application of the District's law did not violate either due process or full faith and credit requirements, the Court in effect treated the question as a constitutional choice-of-law issue.

[17] The Court has upheld choice-of-law decisions challenged on constitutional grounds in numerous other decisions. See *Nevada* v. *Hall, supra*

tive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair. Application of this principle to the facts of this case persuades us that the Minnesota Supreme Court's choice of its own law did not offend the Federal Constitution.

## III

Minnesota has three contacts with the parties and the occurrence giving rise to the litigation. In the aggregate, these contacts permit selection by the Minnesota Supreme Court of Minnesota law allowing the stacking of Mr. Hague's uninsured motorist coverages.

First, and for our purposes a very important contact, Mr. Hague was a member of Minnesota's work force, having been employed by a Red Wing, Minn., enterprise for the 15

---

(upholding California's application of California law to automobile accident in California between two California residents and a Nevada official driving car owned by State of Nevada while engaged in official business in California); *Carroll* v. *Lanza,* 349 U. S. 408 (1955) (upholding Arkansas' choice of Arkansas law where Missouri employee executed employment contract with Missouri employer and was injured on job in Arkansas but was removed immediately to a Missouri hospital); *Watson* v. *Employers Liability Assurance Corp.,* 348 U. S. 66 (1954) (allowing application of Louisiana direct action statute by Louisiana resident against insurer even though policy was written and delivered in another State, where plaintiff was injured in Louisiana); *Pacific Employers Ins. Co.* v. *Industrial Accident Comm'n,* 306 U. S. 493 (1939) (holding Full Faith and Credit Clause not violated where California applied own Workmen's Compensation Act in case of injury suffered by Massachusetts employee temporarily in California in course of employment). Thus, *Nevada* v. *Hall, supra,* and *Watson* v. *Employers Liability Assurance Corp., supra,* upheld application of forum law where the relevant contacts consisted of plaintiff's residence and the place of the injury. *Pacific Employers Ins. Co.* v. *Industrial Accident Comm'n, supra,* and *Carroll* v. *Lanza, supra,* relied on the place of the injury arising from the respective employee's temporary presence in the forum State in connection with his employment.

years preceding his death. While employment status may implicate a state interest less substantial than does resident status, that interest is nevertheless important. The State of employment has police power responsibilities towards the nonresident employee that are analogous, if somewhat less profound, than towards residents. Thus, such employees use state services and amenities and may call upon state facilities in appropriate circumstances.

In addition, Mr. Hague commuted to work in Minnesota, a contact which was important in *Cardillo* v. *Liberty Mutual Ins. Co.,* 330 U. S., at 475–476 (daily commute between residence in District of Columbia and workplace in Virginia), and was presumably covered by his uninsured motorist coverage during the commute.[18] The State's interest in its commuting nonresident employees reflects a state concern for the safety and well-being of its work force and the concomitant effect on Minnesota employers.

That Mr. Hague was not killed while commuting to work or while in Minnesota does not dictate a different result. To hold that the Minnesota Supreme Court's choice of Minnesota law violated the Constitution for that reason would require too narrow a view of Minnesota's relationship with the parties and the occurrence giving rise to the litigation. An automobile accident need not occur within a particular jurisdiction for that jurisdiction to be connected to the occurrence.[19]

---

[18] The policy issued to Mr. Hague provided that Allstate would pay to the insured, or his legal representative, damages "sustained by the insured, caused by accident and arising out of the ownership, maintenance or use of [an] uninsured automobile. . . ." No suggestion has been made that Mr. Hague's uninsured motorist protection is unavailable because he was not killed while driving one of his insured automobiles.

[19] Numerous cases have applied the law of a jurisdiction other than the situs of the injury where there existed some other link between that jurisdiction and the occurrence. See, *e. g., Cardillo* v. *Liberty Mutual Ins. Co.,* 330 U. S. 469 (1947); *Alaska Packers Assn.* v. *Industrial Accident Comm'n,* 294 U. S. 532 (1935); *Rosenthal* v. *Warren,* 475 F. 2d 438 (CA2), cert. denied, 414 U. S. 856 (1973); *Clark* v. *Clark,* 107 N. H. 351, 222 A. 2d 205

Similarly, the occurrence of a crash fatal to a Minnesota employee in another State is a Minnesota contact.[20] If Mr. Hague had only been injured and missed work for a few weeks, the effect on the Minnesota employer would have been palpable and Minnesota's interest in having its employee made whole would be evident. Mr. Hague's death affects Minnesota's interest still more acutely, even though Mr. Hague will not return to the Minnesota work force. Minnesota's work force is surely affected by the level of protection the State extends to it, either directly or indirectly. Vindication of the rights of the estate of a Minnesota employee, therefore, is an important state concern.

Mr. Hague's residence in Wisconsin does not—as Allstate seems to argue—constitutionally mandate application of Wisconsin law to the exclusion of forum law.[21] If, in the in-

---

(1966); *Tooker* v. *Lopez*, 24 N. Y. 2d 569, 249 N. E. 2d 394 (1969); *Babcock* v. *Jackson*, 12 N. Y. 2d 473, 191 N. E. 2d 279 (1963).

[20] The injury or death of a resident of State A in State B is a contact of State A with the occurrence in State B. See cases cited in n. 19, *supra*.

[21] Petitioner's statement that the instant dispute involves the interpretation of insurance contracts which were "underwritten, applied for, and paid for by Wisconsin residents and issued covering cars garaged in Wisconsin," Brief for Petitioner 6, is simply another way of stating that Mr. Hague was a Wisconsin resident. Respondent could have replied that the insurance contract was underwritten, applied for and paid for by a Minnesota worker, and issued covering cars that were driven to work in Minnesota and garaged there for a substantial portion of the day. The former statement is hardly more significant than the latter since the accident in any event did not involve any of the automobiles which were covered under Mr. Hague's policy. Recovery is sought pursuant to the uninsured motorist coverage.

In addition, petitioner's statement that the contracts were "underwritten . . . by Wisconsin residents" is not supported by the stipulated facts if petitioner means to include itself within that phrase. Indeed, the policy, which is part of the record, recites that Allstate signed the policy in Northbrook, Ill. Under some versions of the hoary rule of *lex loci contractus*, and depending on the precise sequence of events, a sequence which is unclear from the record before us, the law of Illinois arguably might apply to govern contract construction, even though Illinois

stant case, the accident had occurred in Minnesota between
Mr. Hague and an uninsured Minnesota motorist, if the in-
surance contract had been executed in Minnesota covering a
Minnesota registered company automobile which Mr. Hague
was permitted to drive, and if a Wisconsin court sought to
apply Wisconsin law, certainly Mr. Hague's residence in Wis-
consin, his commute between Wisconsin and Minnesota, and
the insurer's presence in Wisconsin should be adequate to
apply Wisconsin's law.[22]  See generally *Cardillo* v. *Liberty*

would have less contact with the parties and the occurrence than either
Wisconsin or Minnesota. No party sought application of Illinois law on
that basis in the court below.

[22] Of course Allstate could not be certain that Wisconsin law would
necessarily govern any accident which occurred in Wisconsin, whether
brought in the Wisconsin courts or elsewhere. Such an expectation would
give controlling significance to the wooden *lex loci delicti* doctrine. While
the place of the accident is a factor to be considered in choice-of-law
analysis, to apply blindly the traditional, but now largely abandoned,
doctrine, Silberman, *supra* n. 11, at 80, n. 259; see n. 11, *supra*, would
fail to distinguish between the relative importance of various legal
issues involved in a lawsuit as well as the relationship of other juris-
dictions to the parties and the occurrence or transaction. If, for ex-
ample, Mr. Hague had been a Wisconsin resident and employee who was
injured in Wisconsin and was then taken by ambulance to a hospital in
Red Wing, Minn., where he languished for several weeks before dying,
Minnesota's interest in ensuring that its medical creditors were paid would
be obvious. Moreover, under such circumstances, the accident itself might
be reasonably characterized as a bistate occurrence beginning in Wiscon-
sin and ending in Minnesota. Thus, reliance by the insurer that Wisconsin
law would necessarily govern any accident that occurred in Wisconsin,
or that the law of another jurisdiction would necessarily govern any
accident that did not occur in Wisconsin, would be unwarranted. See n.
11, *supra;* cf. *Rosenthal* v. *Warren, supra* (Massachusetts hospital could
not have purchased insurance with expectation that Massachusetts law
would govern damages recovery as to New York patient who died in
hospital and whose widow brought suit in New York).

If the law of a jurisdiction other than Wisconsin did govern, there was
a substantial likelihood, with respect to uninsured motorist coverage, that
stacking would be allowed. Stacking was the rule in most States at the
time the policy was issued. Indeed, the Wisconsin Supreme Court, in

*Mutual Ins. Co., supra; Alaska Packers Assn.* v. *Industrial Accident Comm'n,* 294 U. S. 532 (1935); *Home Ins. Co.* v. *Dick,* 281 U. S., at 408, n. 5. Employment status is not a sufficiently less important status than residence, see generally *Carroll* v. *Lanza,* 349 U. S. 408 (1955); *Alaska Packers Assn.* v. *Industrial Accident Comm'n, supra,* when combined with Mr. Hague's daily commute across state lines and the other Minnesota contacts present, to prohibit the choice-of-law result in this case on constitutional grounds.

Second, Allstate was at all times present and doing business in Minnesota.[23] By virtue of its presence, Allstate can hardly claim unfamiliarity with the laws of the host jurisdiction and surprise that the state courts might apply forum law to liti-

---

*Nelson* v. *Employers Mutual Casualty Co.,* 63 Wis. 2d 558, 563–566, and nn. 2, 3, 217 N. W. 2d 670, 672, 674, and nn. 2, 3 (1974), identified 29 States, including Minnesota, whose law it interpreted to allow stacking, and only 9 States whose law it interpreted to prohibit stacking. Clearly then, Allstate could not have expected that an antistacking rule would govern any particular accident in which the insured might be involved and thus cannot claim unfair surprise from the Minnesota Supreme Court's choice of forum law.

[23] The Court has recognized that examination of a State's contacts may result in divergent conclusions for jurisdiction and choice-of-law purposes. See *Kulko* v. *California Superior Court,* 436 U. S. 84, 98 (1978) (no jurisdiction in California but California law "arguably might" apply); *Shaffer* v. *Heitner,* 433 U. S., at 215 (no jurisdiction in Delaware, although Delaware interest "may support the application of Delaware law"); cf. *Hanson* v. *Denckla,* 357 U. S. 235, 254, and n. 27 (1958) (no jurisdiction in Florida; the "issue is personal jurisdiction, not choice of law," an issue which the Court found no need to decide). Nevertheless, "both inquiries 'are often closely related and to a substantial degree depend upon similar considerations.'" *Shaffer,* 433 U. S., at 224–225 (BRENNAN, J., concurring in part and dissenting in part). Here, of course, jurisdiction in the Minnesota courts is unquestioned, a factor not without significance in assessing the constitutionality of Minnesota's choice of its own substantive law. Cf. *id.,* at 225 ("the decision that it is fair to bind a defendant by a State's laws and rules should prove to be highly relevant to the fairness of permitting that same State to accept jurisdiction for adjudicating the controversy").

gation in which the company is involved. "Particularly since the company was licensed to do business in [the forum], it must have known it might be sued there, and that [the forum] courts would feel bound by [forum] law." [24] *Clay* v. *Sun Insurance Office Ltd.*, 363 U. S. 207, 221 (1960) (Black, J., dissenting).[25] Moreover, Allstate's presence in Minnesota gave Minnesota an interest in regulating the company's insurance obligations insofar as they affected both a Minnesota resident and court-appointed representative—respondent—and a longstanding member of Minnesota's work force—Mr. Hague. See *Hoopeston Canning Co.* v. *Cullen*, 318 U. S. 313, 316 (1943).

Third, respondent became a Minnesota resident prior to institution of this litigation. The stipulated facts reveal that she first settled in Red Wing, Minn., the town in which

---

[24] There is no element of unfair surprise or frustration of legitimate expectations as a result of Minnesota's choice of its law. Because Allstate was doing business in Minnesota and was undoubtedly aware that Mr. Hague was a Minnesota employee, it had to have anticipated that Minnesota law might apply to an accident in which Mr. Hague was involved. See *Clay II*, 377 U. S. 179, 182 (1964); *Watson* v. *Employers Liability Assurance Corp.*, 348 U. S., at 72–73; *Alaska Packers Assn.* v. *Industrial Accident Comm'n*, 294 U. S., at 538–543; cf. *Home Ins. Co.* v. *Dick*, 281 U. S., at 404 (neither insurer nor reinsurer present in forum State). Indeed, Allstate specifically anticipated that Mr. Hague might suffer an accident either in Minnesota or elsewhere in the United States, outside of Wisconsin, since the policy it issued offered continental coverage. Cf. *id.*, at 403 (coverage limited to losses occurring in certain Mexican waters which were outside of jurisdiction whose law was applied). At the same time, Allstate did not seek to control construction of the contract since the policy contained no choice-of-law clause dictating application of Wisconsin law. See *Clay II, supra*, at 182 (nationwide coverage of policy and lack of choice-of-law clause).

[25] Justice Black's dissent in the first *Clay* decision, a decision which vacated and remanded a lower-court determination to obtain an authoritative construction of state law that might moot the constitutional question, subsequently commanded majority support in the second *Clay* decision. *Clay II, supra*, at 180–183.

her late husband had worked.[26]   She subsequently moved to Savage, Minn., after marrying a Minnesota resident who operated an automobile service station in Bloomington, Minn. Her move to Savage occurred "almost concurrently," 289 N. W. 2d, at 45, with the initiation of the instant case.[27] There is no suggestion that Mrs. Hague moved to Minnesota in anticipation of this litigation or for the purpose of finding a legal climate especially hospitable to her claim.[28]   The stipulated facts, sparse as they are, negate any such inference.

While *John Hancock Mutual Life Ins. Co.* v. *Yates*, 299 U. S. 178 (1936), held that a postoccurrence change of residence to the forum State was insufficient in and of itself to confer power on the forum State to choose its law, that case did not hold that such a change of residence was irrelevant. Here, of course, respondent's bona fide residence in Minnesota was not the sole contact Minnesota had with this litigation.   And in connection with her residence in Minnesota, respondent was appointed personal representative of Mr. Hague's estate by the Registrar of Probate for the County of Goodhue, Minn.   Respondent's residence and subsequent appointment in Minnesota as personal representative of her late husband's estate constitute a Minnesota contact which gives Minnesota an interest in respondent's recovery, an interest which the court below identified as full compensation for "resident accident victims" to keep them "off welfare rolls" and able "to meet financial obligations." 289 N. W. 2d, at 49.

---

[26] The stipulated facts do not reveal the date on which Mrs. Hague first moved to Red Wing.

[27] These proceedings began on May 28, 1976. Mrs. Hague was remarried on June 19, 1976.

[28] The dissent suggests that considering respondent's postoccurrence change of residence as one of the Minnesota contacts will encourage forum shopping. *Post*, at 337. This overlooks the fact that her change of residence was bona fide and not motivated by litigation considerations.

In sum, Minnesota had a significant aggregation[29] of contacts with the parties and the occurrence, creating state interests, such that application of its law was neither arbitrary nor fundamentally unfair. Accordingly, the choice of Minnesota law by the Minnesota Supreme Court did not violate the Due Process Clause or the Full Faith and Credit Clause.

· *Affirmed.*

JUSTICE STEWART took no part in the consideration or decision of this case.

JUSTICE STEVENS, concurring in the judgment.

As I view this unusual case—in which neither precedent nor constitutional language provides sure guidance—two separate questions must be answered. First, does the Full Faith and Credit Clause[1] *require* Minnesota, the forum State, to apply Wisconsin law? Second, does the Due Process Clause[2] of the Fourteenth Amendment *prevent* Minnesota from applying its own law? The first inquiry implicates the federal interest in ensuring that Minnesota respect the sovereignty of the State of Wisconsin; the second implicates the litigants' interest in a fair adjudication of their rights.[3]

---

[29] We express no view whether the first two contacts, either together or separately, would have sufficed to sustain the choice of Minnesota law made by the Minnesota Supreme Court.

[1] Article IV, § 1, provides:

"Full Faith and Credit shall be given in each State to the public Acts, Records, and Judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof."

[2] Section 1 of the Fourteenth Amendment provides, in part:

"No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."

[3] The two questions presented by the choice-of-law issue arise only after it is assumed or established that the defendant's contacts with the forum State are sufficient to support personal jurisdiction. Although the choice-of-law concerns—respect for another sovereign and fairness to the liti-

I realize that both this Court's analysis of choice-of-law questions [4] and scholarly criticism of those decisions [5] have treated these two inquiries as though they were indistinguish-

gants—are similar to the two functions performed by the jurisdictional inquiry, they are not identical. In *World-Wide Volkswagen Corp.* v. *Woodson,* 444 U. S. 286, 291–292 (1980), we stated:

"The concept of minimum contacts, in turn, can be seen to perform two related, but distinguishable, functions. It protects the defendant against the burdens of litigating in a distant or inconvenient forum. And it acts to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system."

See also Reese, Legislative Jurisdiction, 78 Colum. L. Rev. 1587, 1589–1590 (1978). While it has been suggested that this same minimum-contacts analysis be used to define the constitutional limitations on choice of law, see, *e. g.,* Martin, Personal Jurisdiction and Choice of Law, 78 Mich. L. Rev. 872 (1980), the Court has made it clear over the years that the personal jurisdiction and choice-of-law inquiries are not the same. See *Kulko* v. *California Superior Court,* 436 U. S. 84, 98 (1978); *Shaffer* v. *Heitner,* 433 U. S. 186, 215 (1977); *id.,* at 224–226 (BRENNAN, J., dissenting in part); *Hanson* v. *Denckla,* 357 U. S. 235, 253–254 (1958); *id.,* at 258 (Black, J., dissenting).

[4] Although the Court has struck down a state court's choice of forum law on both due process, see, *e. g., Home Ins. Co.* v. *Dick,* 281 U. S. 397 (1930), and full faith and credit grounds, see, *e. g., John Hancock Mutual Life Ins. Co.* v. *Yates,* 299 U. S. 178 (1936), no clear analytical distinction between the two constitutional provisions has emerged. The Full Faith and Credit Clause, of course, was inapplicable in *Home Ins. Co.* because the law of a foreign nation, rather than of a sister State, was at issue; a similarly clear explanation for the Court's reliance upon the Full Faith and Credit Clause in *John Hancock Mutual Life Ins.* cannot be found. Indeed, *John Hancock Mutual Life Ins.* is probably best understood as a due process case. See Reese, *supra,* at 1589, and n. 17; Weintraub, Due Process and Full Faith and Credit Limitations on a State's Choice of Law, 44 Iowa L. Rev. 449, 457–458 (1959).

[5] See R. Leflar, American Conflicts Law § 5, p. 7, § 55, pp. 106–107 (3d ed. 1977). The Court's frequent failure to distinguish between the two Clauses in the choice-of-law context may underlie the suggestions of various commentators that either the Full Faith and Credit Clause or the Due Process Clause be recognized as the single appropriate source for

able.[6]   Nevertheless, I am persuaded that the two constitutional provisions protect different interests and that proper analysis requires separate consideration of each.

I

The Full Faith and Credit Clause is one of several provisions in the Federal Constitution designed to transform the several States from independent sovereignties into a single, unified Nation.  See *Thomas* v. *Washington Gas Light Co.,* 448 U. S. 261, 271–272 (1980) (plurality opinion); *Milwaukee County* v. *M. E. White Co.,* 296 U. S. 268, 276–277 (1935).[7] The Full Faith and Credit Clause implements this design by directing that a State, when acting as the forum for litigation having multistate aspects or implications, respect the legitimate interests of other States and avoid infringement upon their sovereignty.   The Clause does not, however, rigidly

constitutional limitations on choice of law.  Compare Martin, Constitutional Limitations on Choice of Law, 61 Cornell L. Rev. 185 (1976) (full faith and credit), with Reese, *supra* (due process); see also Kirgis, The Roles of Due Process and Full Faith and Credit in Choice of Law, 62 Cornell L. Rev. 94 (1976).

[6] Even when the Court has explicitly considered both provisions in a single case, the requirements of the Due Process and Full Faith and Credit Clauses have been measured by essentially the same standard. For example, in *Watson* v. *Employers Liability Assurance Corp.,* 348 U. S. 66 (1954), the Court separately considered the due process and full faith and credit questions.  See *id.,* at 70–73.  However, in concluding that the Full Faith and Credit Clause did not bar the Louisiana courts from applying Louisiana law in that case, the Court substantially relied upon its preceding analysis of the requirements of due process.  *Id.,* at 73.  By way of contrast, in *Alaska Packers Assn.* v. *Industrial Accident Comm'n,* 294 U. S. 532, 544–550 (1935), the Court's full faith and credit analysis differed significantly from its due process analysis.  However, as noted in the plurality opinion, *ante,* at 308, n. 10, the Court has since abandoned the full faith and credit standard represented by *Alaska Packers.*

[7] See also Sumner, The Full-Faith-and-Credit-Clause—Its History and Purpose, 34 Or. L. Rev. 224, 242 (1955); Weintraub, *supra,* at 477; R. Leflar, *supra,* § 73, p. 143.

require the forum State to apply foreign law whenever another State has a valid interest in the litigation. See *Nevada v. Hall,* 440 U. S. 410, 424 (1979); *Alaska Packers Assn. v. Industrial Accident Comm'n,* 294 U. S. 532, 546–548 (1935); *Pacific Employers Ins. Co. v. Industrial Accident Comm'n,* 306 U. S. 493, 501–502 (1939).[8] On the contrary, in view of the fact that the forum State is also a sovereign in its own right, in appropriate cases it may attach paramount importance to its own legitimate interests.[9] Accordingly, the fact that a choice-of-law decision may be unsound as a matter of conflicts law does not necessarily implicate the federal concerns embodied in the Full Faith and Credit Clause. Rather, in my opinion, the Clause should not invalidate a state court's choice of forum law unless that choice threatens the federal interest in national unity by unjustifiably infringing upon the legitimate interests of another State.[10]

---

[8] As the Court observed in *Alaska Packers, supra,* an overly rigid application of the Full Faith and Credit Clause would produce anomalous results:

"A rigid and literal enforcement of the full faith and credit clause, without regard to the statute of the forum, would lead to the absurd result that, wherever the conflict arises, the statute of each state must be enforced in the courts of the other, but cannot be in its own." 294 U. S., at 547.

[9] For example, it is well established that "the Full Faith and Credit Clause does not require a State to apply another State's law in violation of its own legitimate public policy." *Nevada v. Hall,* 440 U. S. 410, 422 (1979) (footnote omitted).

[10] The kind of state action the Full Faith and Credit Clause was designed to prevent has been described in a variety of ways by this Court. In *Carroll v. Lanza,* 349 U. S. 408, 413 (1955), the Court indicated that the Clause would be invoked to restrain "any policy of hostility to the public Acts" of another State. In *Nevada v. Hall, supra,* at 424, n. 24, we approved action which "pose[d] no substantial threat to our constitutional system of cooperative federalism." And in *Thomas v. Washington Gas Light Co.,* 448 U. S. 261, 272 (1980), the plurality opinion described the purpose of the Full Faith and Credit Clause as the prevention of "parochial entrenchment on the interests of other States."

In this case, I think the Minnesota courts' decision to apply Minnesota law was plainly unsound as a matter of normal conflicts law. Both the execution of the insurance contract and the accident giving rise to the litigation took place in Wisconsin. Moreover, when both of those events occurred, the plaintiff, the decedent, and the operators of both vehicles were all residents of Wisconsin. Nevertheless, I do not believe that any threat to national unity or Wisconsin's sovereignty ensues from allowing the substantive question presented by this case to be determined by the law of another State.

The question on the merits is one of interpreting the meaning of the insurance contract. Neither the contract itself, nor anything else in the record, reflects any express understanding of the parties with respect to what law would be applied or with respect to whether the separate uninsured motorist coverage for each of the decedent's three cars could be "stacked." Since the policy provided coverage for accidents that might occur in other States, it was obvious to the parties at the time of contracting that it might give rise to the application of the law of States other than Wisconsin. Therefore, while Wisconsin may have an interest in ensuring that contracts formed in Wisconsin in reliance upon Wisconsin law are interpreted in accordance with that law, that interest is not implicated in this case.[11]

---

[11] While the justifiable expectations of the litigants are a major concern for purposes of due process scrutiny of choice-of-law decisions, see Part II, *infra,* the decision in *John Hancock Mutual Life Ins. Co.* v. *Yates,* 299 U. S. 178 (1936), suggests that this concern may also implicate state interests cognizable under the Full Faith and Credit Clause. In *John Hancock Mutual Life Ins.,* the Court struck down on full faith and credit grounds a Georgia court's choice of Georgia law over a conflicting New York statute in a suit on a New York life insurance contract brought after the insured's death in New York. Central to the decision in that case was the Court's apparent concern that application of Georgia law would result in unfair surprise to one of the contracting parties. The Court found that

Petitioner has failed to establish that Minnesota's refusal to apply Wisconsin law poses any direct [12] or indirect threat to Wisconsin's sovereignty.[13] In the absence of any such

the New York statute was "a rule of substantive law which became a term of the contract, as much so as the amount of the premium to be paid or the time for its payment." *Id.*, at 182 (footnote omitted). This statute "determine[d] the substantive rights of the parties as fully as if a provision to that effect had been embodied in writing in the policy." *Id.*, at 182–183. The insurer had no reason to expect that the New York statute would not control all claims arising under the life insurance policy. The parties to a life insurance contract normally would not expect the place of death to have any bearing upon the proper construction of the policy; by way of contrast, in the case of a liability policy, the place of the tort might well be relevant. For that reason, in a life insurance contract relationship, it is likely that neither party would expect the law of any State other than the place of contracting to have any relevance in possible subsequent litigation. See generally C. Carnahan, Conflict of Laws and Life Insurance Contracts § 15, pp. 51–52, § 47, pp. 264–265, 267–268, § 60, pp. 325–327 (2d ed. 1958).

Paul Freund has aptly characterized *John Hancock Mutual Life Ins.* as perhaps this Court's "most ambitious application of the full faith and credit clause." Freund, Chief Justice Stone and the Conflict of Laws, 59 Harv. L. Rev. 1210, 1233 (1946). Like *Bradford Electric Light Co.* v. *Clapper*, 286 U. S. 145 (1932), on which the Court relied, see 299 U. S., at 183, *John Hancock Mutual Life Ins.* was one of a series of constitutional decisions in the 1930's that have been limited by subsequent cases. See *Carroll* v. *Lanza*, 349 U. S., at 412; *Thomas* v. *Washington Gas Light Co.*, *supra*, at 272–273, n. 18 (plurality opinion). See also Traynor, Is This Conflict Really Necessary?, 37 Texas L. Rev. 657, 675 (1959).

[12] Compare *Nevada* v. *Hall, supra*, in which the Court permitted a California court to disregard Nevada's statutory limitation on damages available against the State. The Court found this direct intrusion upon Nevada's sovereignty justified because the Nevada statute was "obnoxious" to California's public policy. *Id.*, at 424.

[13] It is clear that a litigant challenging the forum's application of its own law to a lawsuit properly brought in its courts bears the burden of establishing that this choice of law infringes upon interests protected by the Full Faith and Credit Clause. See *Alaska Packers Assn.* v. *Industrial Accident Comm'n*, 294 U. S., at 547–548.

It is equally clear that a state court's decision to apply its own law cannot violate the Full Faith and Credit Clause where the application of

threat, I find it unnecessary to evaluate the forum State's interest in the litigation in order to reach the conclusion that the Full Faith and Credit Clause does not require the Minnesota courts to apply Wisconsin law to the question of contract interpretation presented in this case.

## II

It may be assumed that a choice-of-law decision would violate the Due Process Clause if it were totally arbitrary or if it were fundamentally unfair to either litigant. I question whether a judge's decision to apply the law of his own State could ever be described as wholly irrational. For judges are presumably familiar with their own state law and may find it difficult and time consuming to discover and apply correctly the law of another State.[14] The forum State's interest in the fair and efficient administration of justice is therefore sufficient, in my judgment, to attach a presumption of validity to a forum State's decision to apply its own law to a dispute over which it has jurisdiction.

The forum State's interest in the efficient operation of its judicial system is clearly not sufficient, however, to justify the application of a rule of law that is fundamentally unfair to one of the litigants. Arguably, a litigant could demonstrate such unfairness in a variety of ways. Concern about the fairness of the forum's choice of its own rule might arise

---

forum law does not impinge at all upon the interests of other States. Cf. Reese, *supra* n. 3, at 1601.

[14] This task can be particularly difficult for a trial judge who does not have ready access to a law library containing the statutes and decisions of all 50 States. If that judge is able to apply law with which he is thoroughly familiar or can easily discover, substantial savings can accrue to the State's judicial system. Moreover, an erroneous interpretation of the governing rule is less likely when the judge is applying a familiar rule. Cf. *Shaffer* v. *Heitner*, 433 U. S., at 225–226 (BRENNAN, J., dissenting in part) (such concerns indicate that a State's ability to apply its own law to a transaction should be relevant for purposes of evaluating its power to exercise jurisdiction over the parties to that transaction).

if that rule favored residents over nonresidents, if it represented a dramatic departure from the rule that obtains in most American jurisdictions, or if the rule itself was unfair on its face or as applied.[15]

The application of an otherwise acceptable rule of law may result in unfairness to the litigants if, in engaging in the activity which is the subject of the litigation, they could not reasonably have anticipated that their actions would later be judged by this rule of law. A choice-of-law decision that frustrates the justifiable expectations of the parties can be fundamentally unfair. This desire to prevent unfair surprise to a litigant has been the central concern in this Court's review of choice-of-law decisions under the Due Process Clause.[16]

Neither the "stacking" rule itself, nor Minnesota's application of that rule to these litigants, raises any serious question of fairness. As the plurality observes, "[s]tacking was

[15] Discrimination against nonresidents would be constitutionally suspect even if the Due Process Clause were not a check upon a State's choice-of-law decisions. See Currie & Schreter, Unconstitutional Discrimination in the Conflict of Laws: Equal Protection, 28 U. Chi. L. Rev. 1 (1960); Currie & Schreter, Unconstitutional Discrimination in the Conflict of Laws: Privileges and Immunities, 69 Yale L. J. 1323 (1960); Note, Unconstitutional Discrimination in Choice of Law, 77 Colum. L. Rev. 272 (1977). Moreover, both discriminatory and substantively unfair rules of law may be detected and remedied without any special choice-of-law analysis; familiar constitutional principles are available to deal with both varieties of unfairness. See, e. g., Martin, supra n. 5, at 199.

[16] Upon careful analysis, most of the decisions of this Court that struck down on due process grounds a state court's choice of forum law can be explained as attempts to prevent a State with a minimal contact with the litigation from materially enlarging the contractual obligations of one of the parties where that party had no reason to anticipate the possibility of such enlargement. See, e. g., Home Ins. Co. v. Dick, 281 U. S. 397 (1930); Hartford Accident & Indemnity Co. v. Delta & Pine Land Co., 292 U. S. 143 (1934); cf. John Hancock Mutual Life Ins. Co. v. Yates, 299 U. S. 178 (1936) (similar concern under Full Faith and Credit Clause, see n. 11, supra). See generally Weintraub, supra n. 4, at 457–460.

the rule in most States at the time the policy was issued."
*Ante,* at 316, n. 22.[17]  Moreover, the rule is consistent with
the economics of a contractual relationship in which the
policyholder paid three separate premiums for insurance cov-
erage for three automobiles, including a separate premium
for each uninsured motorist coverage.[18]  Nor am I persuaded
that the decision of the Minnesota courts to apply the "stack-
ing" rule in this case can be said to violate due process be-
cause that decision frustrates the reasonable expectations of
the contracting parties.

Contracting parties can, of course, make their expectations
explicit by providing in their contract either that the law of
a particular jurisdiction shall govern questions of contract
interpretation,[19] or that a particular substantive rule, for in-
stance "stacking," shall or shall not apply.[20]  In the absence

---

[17] See also *Nelson* v. *Employers Mutual Casualty Co.,* 63 Wis. 2d 558,
563–566, and nn. 2, 3, 217 N. W. 2d 670, 672–674, and nn. 2, 3 (1974),
discussed *ante,* at 316–317, n. 22.

[18] The "stacking" rule provides that all of the uninsured motorist cov-
erage purchased by an insured party may be aggregated, or "stacked," to
create a fund available to provide a recovery for a single accident.

[19] For example, in *Home Ins. Co.* v. *Dick, supra,* at 403, and n. 1, the
insurance policy was subject, by its express terms, to Mexican law.

[20] *Home Ins. Co., supra,* again provides a useful example.  In that
case, the insurance policy expressly provided a 1-year limitations period
for claims arising thereunder.  *Id.,* at 403.  Similarly, the insurance policy
at issue in *Hartford Accident & Indemnity Co.* v. *Delta & Pine Land Co.,
supra,* at 146, also prescribed a specific limitations period.

While such express provisions are obviously relevant, they are not always
dispositive.  In *Clay* v. *Sun Insurance Office, Ltd.,* 377 U. S. 179 (1964),
the Court allowed the lower court's choice of forum law to override an
express contractual limitations period.  The Court emphasized the fact
that the insurer had issued the insurance policy with the knowledge
that it would cover the insured property wherever it was taken.  *Id.,* at
181–182.  The Court also noted that the insurer had not attempted to
provide in the policy that the law of another State would control.  *Id.,*
at 182.

In *Watson* v. *Employers Liability Assurance Corp.,* 348 U. S., at 68, the
insurance policy expressly provided that an injured party could not main-

of such express provisions, the contract nonetheless may implicitly reveal the expectations of the parties. For example, if a liability insurance policy issued by a resident of a particular State provides coverage only with respect to accidents within that State, it is reasonable to infer that the contracting parties expected that their obligations under the policy would be governed by that State's law.[21]

In this case, no express indication of the parties' expectations is available. The insurance policy provided coverage for accidents throughout the United States; thus, at the time of contracting, the parties certainly could have anticipated that the law of States other than Wisconsin would govern particular claims arising under the policy.[22] By virtue of doing busi-

___

tain a direct action against the insurer until after the insured's liability had been determined. The Court found that neither the Due Process Clause nor the Full Faith and Credit Clause prevented the Louisiana courts from applying forum law to permit a direct action against the insurer prior to determination of the insured's liability. As in Clay, the Court noted that the policy provided coverage for injuries anywhere in the United States. 348 U. S., at 71–72. An additional, although unarticulated, factor in Watson was the fact that the litigant urging that forum law be applied was not a party to the insurance contract. While contracting parties may be able to provide in advance that a particular rule of law will govern disputes between them, their expectations are clearly entitled to less weight when the rights of third-party litigants are at issue.

[21] In Home Ins. Co., supra, the insurance policy was issued in Mexico by a Mexican corporation and covered the insured vessel only in certain Mexican waters. Id., at 403.

[22] In Clay v. Sun Insurance Office, Ltd., supra, at 182, and Watson v. Employers Liability Assurance Corp., supra, at 71–72, the Court considered it significant, in upholding the lower courts' choice of forum law, that the insurance policies provided coverage throughout the United States. See n. 20, supra. Of course, in both Clay and Watson the loss to which the insurance applied actually occurred in the forum State, whereas the accident in this case occurred in Wisconsin, not Minnesota. However, as the dissent recognizes, post, at 336–337, because the question on the merits is one of contract interpretation rather than tort liability, the actual site of the accident is not dispositive with respect to the due process inquiry. More relevant is the fact that the parties, at the time of con-

ness in Minnesota, Allstate was aware that it could be sued in the Minnesota courts; Allstate also presumably was aware that Minnesota law, as well as the law of most States, permitted "stacking." Nothing in the record requires that a different inference be drawn. Therefore, the decision of the Minnesota courts to apply the law of the forum in this case does not frustrate the reasonable expectations of the contracting parties, and I can find no fundamental unfairness in that decision requiring the attention of this Court.[23]

---

tracting, anticipated that an accident covered by the policy could occur in a "stacking" State. The fact that this particular accident did not occur in Minnesota does not undercut the expectations formed by the parties at the time of contracting.

In *Hartford Accident & Indemnity Co.* v. *Delta & Pine Land Co.,* *supra,* the Court struck down a state court's choice of forum law despite the fact that the insurance contract's coverage was not limited by state boundaries. While *Hartford Accident* may indeed have "scant relevance for today," *ante,* at 309, n. 11, it is nonetheless consistent with a due process analysis based upon fundamental fairness to the parties. One of the statutes applied by the Mississippi courts in *Hartford Accident* was offensively broad, providing that "[a]ll contracts of insurance on property, lives or interests in this state shall be deemed to be made therein." 292 U. S., at 148. No similar statute is involved in this case. In addition, the Mississippi courts applied the law of the forum to override an express contractual provision, and thus frustrated the expectations of the contracting parties. In the present case, the insurance contract contains no similar declaration of the intent of the parties.

[23] Comparison of this case with *Home Ins. Co.* v. *Dick,* 281 U. S. 397 (1930), confirms my conclusion that the application of Minnesota law in this case does not offend the Due Process Clause. In *Home Ins. Co.,* the contract expressly provided that a particular limitations period would govern claims arising under the insurance contract and that Mexican law was to be applied in interpreting the contract; in addition, the contract was limited in effect to certain Mexican waters. The parties could hardly have made their expectations with respect to the applicable law more plain. In this case, by way of contrast, nothing in the contract suggests that Wisconsin law should be applied or that Minnesota's "stacking" rule should not be applied. In this case, unlike *Home Ins. Co.,* the court's choice of forum law results in no unfair surprise to the insurer.

In terms of fundamental fairness, it seems to me that two factors relied upon by the plurality—the plaintiff's post-accident move to Minnesota and the decedent's Minnesota employment—are either irrelevant to or possibly even tend to undermine the plurality's conclusion. When the expectations of the parties at the time of contracting are the central due process concern, as they are in this case, an unanticipated postaccident occurrence is clearly irrelevant for due process purposes. The fact that the plaintiff became a resident of the forum State after the accident surely cannot justify a ruling in her favor that would not be made if the plaintiff were a nonresident. Similarly, while the fact that the decedent regularly drove into Minnesota might be relevant to the expectations of the contracting parties,[24] the fact that he did so because he was employed in Minnesota adds nothing to the due process analysis. The choice-of-law decision of the Minnesota courts is consistent with due process because it does not result in unfairness to either litigant, not because Minnesota now has an interest in the plaintiff as resident or formerly had an interest in the decedent as employee.

## III

Although I regard the Minnesota courts' decision to apply forum law as unsound as a matter of conflicts law, and there

---

[24] Even this factor may not be of substantial significance. At the time of contracting, the parties were aware that the insurance policy was effective throughout the United States and that the law of any State, including Minnesota, might be applicable to particular claims. The fact that the decedent regularly drove to Minnesota, for whatever purpose, is relevant only to the extent that it affected the parties' evaluation, at the time of contracting, of the likelihood that Minnesota law would actually be applied at some point in the future. However, because the applicability of Minnesota law was perceived as possible at the time of contracting, it does not seem especially significant for due process purposes that the parties may also have considered it likely that Minnesota law would be applied. This factor merely reinforces the expectation revealed by the policy's national coverage.

is little in this record other than the presumption in favor of the forum's own law to support that decision, I concur in the plurality's judgment. It is not this Court's function to establish and impose upon state courts a federal choice-of-law rule, nor is it our function to ensure that state courts correctly apply whatever choice-of-law rules they have themselves adopted.[25] Our authority may be exercised in the choice-of-law area only to prevent a violation of the Full Faith and Credit or the Due Process Clause. For the reasons stated above, I find no such violation in this case.

JUSTICE POWELL, with whom THE CHIEF JUSTICE and JUSTICE REHNQUIST join, dissenting.

My disagreement with the plurality is narrow. I accept with few reservations Part II of the plurality opinion, which sets forth the basic principles that guide us in reviewing state choice-of-law decisions under the Constitution. The Court should invalidate a forum State's decision to apply its own law only when there are no significant contacts between the State and the litigation. This modest check on state power is mandated by the Due Process Clause of the Fourteenth Amendment and the Full Faith and Credit Clause of Art. IV, § 1. I do not believe, however, that the plurality adequately analyzes the policies such review must serve. In consequence, it has found significant what appear to me to be trivial contacts between the forum State and the litigation.

[25] In *Kryger* v.`*Wilson*, 242 U. S. 171, 176 (1916), after rejecting a due process challenge to a state court's choice of law, the Court stated:

"The most that the plaintiff in error can say is that the state court made a mistaken application of doctrines of the conflict of laws in deciding that the cancellation of a land contract is governed by the law of the *situs* instead of the place of making and performance. But that, being purely a question of local common law, is a matter with which this court is not concerned."

I

At least since *Carroll* v. *Lanza,* 349 U. S. 408 (1955), the Court has recognized that both the Due Process and the Full Faith and Credit Clauses are satisfied if the forum has such significant contacts with the litigation that it has a legitimate state interest in applying its own law. The significance of asserted contacts must be evaluated in light of the constitutional policies that oversight by this Court should serve. Two enduring policies emerge from our cases.

First, the contacts between the forum State and the litigation should not be so "slight and casual" that it would be fundamentally unfair to a litigant for the forum to apply its own State's law. *Clay* v. *Sun Ins. Office, Ltd.,* 377 U. S. 179, 182 (1964). The touchstone here is the reasonable expectation of the parties. See Weintraub, Due Process and Full Faith and Credit Limitations on a State's Choice of Law, 44 Iowa L. Rev. 449, 445–457 (1959) (Weintraub). Thus, in *Clay,* the insurer sold a policy to Clay " 'with knowledge that he could take his property anywhere in the world he saw fit without losing the protection of his insurance.' " 377 U. S., at 182, quoting *Clay* v. *Sun Ins. Office Ltd.,* 363 U. S. 207, 221 (1960) (Black, J., dissenting). When the insured moved to Florida with the knowledge of the insurer, and a loss occurred in that State, this Court found no unfairness in Florida's applying its own rule of decision to permit recovery on the policy. The insurer "must have known it might be sued there." *Ibid.* See also *Watson* v. *Employers Liability Assurance Corp.,* 348 U. S. 66 (1954).[1]

---

[1] *Home Ins. Co.* v. *Dick,* 281 U. S. 397 (1930), is a case where the reasonable expectations of a litigant were frustrated. The insurance contract confined the risk to Mexico, where the loss occurred and where both the insurer and the insured resided until the claim accrued. This Court found a violation of the Due Process Clause when Texas, the forum State, applied a local rule to allow the insured to gain a recovery unavailable under Mexican law. Because of the geographic limitation on the risk, and

Second, the forum State must have a legitimate interest in the outcome of the litigation before it. *Pacific Ins. Co.* v. *Industrial Accident Comm'n,* 306 U. S. 493 (1939). The Full Faith and Credit Clause addresses the accommodation of sovereign power among the various States. Under limited circumstances, it requires one State to give effect to the statutory law of another State. *Nevada* v. *Hall,* 440 U. S. 410, 423 (1979). To be sure, a forum State need not give effect to another State's law if that law is in "violation of its own legitimate public policy." *Id.,* at 422. Nonetheless, for a forum State to further its legitimate public policy by applying its own law to a controversy, there must be some connection between the facts giving rise to the litigation and the scope of the State's lawmaking jurisdiction.

Both the Due Process and Full Faith and Credit Clauses ensure that the States do not "reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *World-Wide Volkswagen Corp.* v. *Woodson,* 444 U. S. 286, 292 (1980) (addressing Fourteenth Amendment limitation on state-court jurisdiction). As the Court stated in *Pacific Ins. Co., supra:* "[T]he full faith and credit clause does not require one state to substitute for its own statute, *applicable to persons and events within it,* the conflicting statute of another state." *Id.,* at 502 (emphasis added). The State has a legitimate interest in applying a rule of decision to the litigation only if the facts to which the rule will be applied have created effects within the State, toward which the State's public policy is directed. To assess the sufficiency of asserted contacts between the forum and the litigation, the court must determine if the contacts form a reasonable link between the litigation and a state policy. In short, examination of contacts addresses whether "the state

because there were no contacts with the forum State until the claim accrued, the insurer could have had no reasonable expectation that Texas law would be applied to interpret its obligations under the contract. See Weintraub 455.

has an interest in the application of its policy in this instance." Currie, The Constitution and the Choice of Law: Governmental Interests and the Judicial Function, in B. Currie, Selected Essays on the Conflict of Laws 188, 189 (1963) (Currie). If it does, the Constitution is satisfied.

*John Hancock Mut. Life Ins. Co.* v. *Yates,* 299 U. S. 178 (1936), illustrates this principle. A life insurance policy was executed in New York, on a New York insured with a New York beneficiary. The insured died in New York; his beneficiary moved to Georgia and sued to recover on the policy. The insurance company defended on the ground that the insured, in the application for the policy, had made materially false statements that rendered it void under New York law. This Court reversed the Georgia court's application of its contrary rule that all questions of the policy's validity must be determined by the jury. The Court found a violation of the Full Faith and Credit Clause, because "[i]n respect to the accrual of the right asserted under the contract . . . there was no occurrence, nothing done, to which the law of Georgia could apply." *Id.,* at 182. In other words, the Court determined that Georgia had no legitimate interest in applying its own law to the legal issue of liability. Georgia's contacts with the contract of insurance were nonexistent.[2] See *Home Ins. Co.* v. *Dick,* 281 U. S. 397, 408 (1930).

In summary, the significance of the contacts between a forum State and the litigation must be assessed in light of

---

[2] "It is manifest that Georgia had no interest in the application to this case of any policy to be found in its laws. When the contract was entered into, and at all times until the insured died, the parties and the transaction were beyond the legitimate reach of whatever policy Georgia may have had. Any interest asserted by Georgia must relate to the circumstance that the action is tried there, and must arise not from any policy directed to the business of life insurance but from some policy having to do with the business of the courts. This was apparently recognized even by the Georgia court; hence the disingenuous characterization of the matter as one of 'procedure' rather than of 'substance.'" Currie 236. See also *id.,* at 232–233.

these two important constitutional policies.[3]  A contact, or a pattern of contacts, satisfies the Constitution when it protects the litigants from being unfairly surprised if the forum State applies its own law, and when the application of the forum's law reasonably can be understood to further a legitimate public policy of the forum State.

## II

Recognition of the complexity of the constitutional inquiry requires that this Court apply these principles with restraint. Applying these principles to the facts of this case, I do not believe, however, that Minnesota had sufficient contacts with the "persons and events" in this litigation to apply its rule permitting stacking.  I would agree that no reasonable expectations of the parties were frustrated.  The risk insured by petitioner was not geographically limited.  See *Clay* v. *Sun Ins. Office, Ltd.*, 377 U. S., at 182.  The close proximity of Hager City, Wis., to Minnesota, and the fact that Hague commuted daily to Red Wing, Minn., for many years should have led the insurer to realize that there was a reasonable probability that the risk would materialize in Minnesota. Under our precedents, it is plain that Minnesota could have applied its own law to an accident occurring within its borders.  See *ante*, at 318, n. 24.  The fact that the accident did not, in fact, occur in Minnesota is not controlling because the expectations of the litigants *before* the cause of

---

[3] The plurality today apparently recognizes that the significance of the contacts must be evaluated in light of the policies our review serves.  It acknowledges that the sufficiency of the same contacts sometimes will differ in jurisdiction and choice-of-law questions.  *Ante*, at 317, n. 23.  The plurality, however, pursues the rationale for the requirement of sufficient contacts in choice-of-law cases no further than to observe that the forum's application of its own law must be "neither arbitrary nor fundamentally unfair."  *Ante*, at 313.  But this general prohibition does not distinguish questions of choice of law from those of jurisdiction, or from much of the jurisprudence of the Fourteenth Amendment.

action accrues provide the pertinent perspective. See Weintraub 455; n. 1, *supra*.

The more doubtful question in this case is whether application of Minnesota's substantive law reasonably furthers a legitimate state interest. The plurality attempts to give substance to the tenuous contacts between Minnesota and this litigation. Upon examination, however, these contacts are either trivial or irrelevant to the furthering of any public policy of Minnesota.

First, the postaccident residence of the plaintiff-beneficiary is constitutionally irrelevant to the choice-of-law question. *John Hancock Mut. Life Ins. Co.* v. *Yates, supra.* The plurality today insists that *Yates* only held that a postoccurrence move to the forum State could not "in and of itself" confer power on the forum to apply its own law, but did not establish that such a change of residence was irrelevant. *Ante,* at 319. What the *Yates* Court held, however, was that "there was no occurrence, *nothing* done, to which the law of Georgia could apply." 299 U. S., at 182 (emphasis added). Any possible ambiguity in the Court's view of the significance of a postoccurrence change of residence is dispelled by *Home Ins. Co.* v. *Dick, supra,* cited by the *Yates* Court, where it was held squarely that Dick's postaccident move to the forum State was "without significance." 281 U. S., at 408.

This rule is sound. If a plaintiff could choose the substantive rules to be applied to an action by moving to a hospitable forum, the invitation to forum shopping would be irresistible. Moreover, it would permit the defendant's reasonable expectations at the time the cause of action accrues to be frustrated, because it would permit the choice-of-law question to turn on a postaccrual circumstance. Finally, postaccrual residence has nothing to do with facts to which the forum State proposes to apply its rule; it is unrelated to the substantive legal issues presented by the litigation.

Second, the plurality finds it significant that the insurer does business in the forum State. *Ante,* at 317–318. The State

does have a legitimate interest in regulating the practices of such an insurer. But this argument proves too much. The insurer here does business in all 50 States. The forum State has no interest in regulating that conduct of the insurer unrelated to property, persons, or contracts executed within the forum State.[4] See *Hoopeston Canning Co.* v. *Cullen*, 318 U. S. 313, 319 (1943). The plurality recognizes this flaw and attempts to bolster the significance of the local presence of the insurer by combining it with the other factors deemed significant: the presence of the plaintiff and the fact that the deceased worked in the forum State. This merely restates the basic question in the case.

Third, the plurality emphasizes particularly that the insured worked in the forum State.[5] *Ante,* at 313–317. The fact that the insured was a nonresident employee in the forum

---

[4] The petitioner in *John Hancock Mut. Life Ins. Co.* v. *Yates,* 299 U. S. 178 (1936), did business in Georgia, the forum State, at the time of that case. See The Insurance Almanac 715 (1935). Also, Georgia extensively regulated insurance practices within the State at that time. See Ga. Code § 56–101 *et seq.* (1933). This Court did not hint in *Yates* that this fact was of the slightest significance to the choice-of-law question, although it would have been crucial for the exercise of *in personam* jurisdiction.

[5] The plurality exacts double service from this fact, by finding a separate contact in that the insured commuted daily to his job. *Ante,* at 314–315. This is merely a repetition of the facts that the insured lived in Wisconsin and worked in Minnesota. The State does have an interest in the safety of motorists who use its roads. This interest is not limited to employees, but extends to all nonresident motorists on its highways. This safety interest, however, cannot encompass, either in logic or in any practical sense, the determination whether a nonresident's estate can stack benefit coverage in a policy written in another State regarding an accident that occurred on another State's roads.

*Cardillo* v. *Liberty Mutual Ins. Co.,* 330 U. S. 469 (1947), hardly establishes commutation as an independent contact; the case merely approved the application of a forum State's law to an industrial accident occurring in a neighboring State when the employer and the employee both resided in the forum State.

State provides a significant contact for the furtherance of some local policies. See, *e. g., Pacific Ins. Co.* v. *Industrial Accident Comm'n,* 306 U. S. 493 (1939) (forum State's interest in compensating workers for employment-related injuries occurring within the State); *Alaska Packers Assn.* v. *Industrial Accident Comm'n,* 294 U. S. 532, 549 (1935) (forum State's interest in compensating the employment-related injuries of a worker hired in the State). The insured's place of employment is not, however, significant in this case. Neither the nature of the insurance policy, the events related to the accident, nor the immediate question of stacking coverage is in any way affected or implicated by the insured's employment status. The plurality's opinion is understandably vague in explaining how trebling the benefits to be paid to the estate of a nonresident employee furthers any substantial state interest relating to employment. Minnesota does not wish its workers to die in automobile accidents, but permitting stacking will not further this interest. The substantive issue here is solely one of compensation, and whether the compensation provided by this policy is increased or not will have no relation to the State's employment policies or police power. See n. 5, *supra.*

Neither taken separately nor in the aggregate do the contacts asserted by the plurality today indicate that Minnesota's application of its substantive rule in this case will further any legitimate state interest.[6] The plurality focuses

---

[6] The opinion of JUSTICE STEVENS concurring in the judgment supports my view that the forum State's application of its own law to this case cannot be justified by the existence of relevant minimum contacts. As JUSTICE STEVENS observes, the principal factors relied on by the plurality are "either irrelevant to or possibly even tend to undermine the [plurality's] conclusion." *Ante,* at 331. The interesting analysis he proposes to uphold the State's judgment is, however, difficult to reconcile with our prior decisions and may create more problems than it solves. For example, it seems questionable to measure the interest of a State in a controversy by the degree of conscious reliance on that State's law by private

only on physical contacts *vel non,* and in doing so pays scant attention to the more fundamental reasons why our precedents require reasonable policy-related contacts in choice-of-law cases. Therefore, I dissent.

---

parties to a contract. *Ante,* at 324. Moreover, scrutinizing the strength of the interests of a nonforum State may draw this Court back into the discredited practice of weighing the relative interests of various States in a particular controversy. See *ante,* at 308, n. 10 (plurality opinion).