**PHP HEALTHCARE CORPORATION,**
Plaintiff–Appellee,

v.

**EMSA LIMITED PARTNERSHIP,**
Defendant–Appellant.

No. 92–2342.

United States Court of Appeals,
Fourth Circuit.

Argued March 30, 1993.

Decided Dec. 29, 1993.

Rule 19(b), *see infra* at 941.

942

**ARGUED:** Michael Paul Curreri, Wright, Robinson, McCammon, Osthimer & Tatum, Richmond, VA, for Appellant.  Eric R. Dannenmaier, Bryan, Cave, Washington, D.C., for Appellee.  **ON BRIEF:** Mark S. Brennan, Sr., Wright, Robinson, McCammon, Osthimer & Tatum, Richmond, VA, for Appellant.  James J. Murphy, Bryan, Cave, Washington, DC; George F. West, Jr., Murphy, McGettigan & West, P.C., Alexandria, VA, for Appellee.

Before PHILLIPS and LUTTIG, Circuit Judges, and FABER, United States District Judge for the Southern District of West Virginia, sitting by designation.

## OPINION

PHILLIPS, Circuit Judge:

This is an appeal by EMSA Limited partnership (EMSA), a contract provider of medical services, from an adverse judgment in a diversity action brought by its competitor, PHP Health Care Corporation (PHP), which turned on the enforceability of a "limitation of practice" covenant in personal services contracts EMSA had with the physicians it employed.  The district court, applying Florida law, held the covenant not enforceable, and gave judgment for PHP.  On EMSA's appeal, we affirm, though on more narrow grounds and on somewhat different reasoning than the district court's.

### I

EMSA, a Florida general partnership, and PHP, a Delaware corporation domiciled in Virginia, compete to provide medical services for the Department of Defense.  At the times in issue here, EMSA had a contract to supply emergency-room physicians for Millington Naval Hospital in Millington, Tennessee.  The contract was to expire in February 1992.  Thereafter, EMSA's nearest client facility would be 65 miles away in Dyersburg, Tennessee.

In November 1991—after submitting bids in competition with EMSA over the summer—PHP was awarded the new contract and shortly thereafter entered into negotiations with and for the services at the Millington facility of physicians then employed there by EMSA: Drs. Richard Mason, Howard Marker, Clyde Smith, Elizabeth Moke–Bush and Eugene Combest ("the Millington physicians" or "physician-employees").  The contracts between EMSA and its physician employees were to terminate simultaneously with expiration of the EMSA–Hospital contract in February 1992.  PHP became aware, however, that those physician-employees were under restrictive covenants in their employment contracts with EMSA which by their terms prohibited them from accepting employment with PHP to continue working at the Millington facility when EMSA's contract with that facility expired in February 1992.[1]

---

1.  EMSA personal services contracts with its various physician employees contained a variety of restrictive or "limitation of practice" covenants.  The one specifically at issue in this case appears in Par. 10 of Dr. Mason's contract, in the following language:

> 10. *Respect of Relationships; Limitation of Practice.*  Employee acknowledges that, in consideration of his/her employment and the provisions contained herein, and to induce Employee to enter into this agreement and to perform its obligations hereunder, he/she will not, throughout the term hereof and after the

termination hereof, for a period of one (1) year: (a) Directly or indirectly for his/her own benefit (whether as an officer, owner, employee, partner, or other participant in any business or venture) provide any similar form of medical services or consulting or staffing services at any client facility under contract with Employer or any of its affiliates (which contract exists at the time of termination of employment or within one (1) year prior to termination).

J.A. 875.  The contracts of the other Millington physicians contained identical provisions, except

PHP notified EMSA that it considered the covenants unenforceable, and promised the EMSA physicians with whom it was negotiating that it would indemnify any who decided to jump ship. PHP performed on that promise for Dr. Mason, the only Millington physician actually to take employment and work for PHP, when EMSA withheld his pay under the terms of the covenant's liquidated damages provision.

PHP then brought this diversity action against EMSA on a three-count complaint. Count I sought a declaratory judgment of the covenant's invalidity. Count II alleged tortious interference with "prospective business relations" with all the Millington physicians, and Count III alleged tortious interference with PHP's newly formed contractual relations with Mason. EMSA counterclaimed, seeking actual and trebled damages under Tennessee law for PHP's alleged tortious interference with EMSA's business and contractual relations with the Millington physicians.

On EMSA's motion, the district court then dismissed PHP's Count I, which sought a declaratory judgment of the covenant's invalidity, on the basis that as a non-party to the restrictive covenant, PHP lacked standing to challenge it by this means, and dismissed Count III, which alleged tortious interference with PHP's contract with Mason, on the basis that, containing no allegation of Mason's breach of his new PHP contract, it failed to state a claim under Tennessee law. PHP then, by leave, filed an amended two-count complaint. Count I realleged tortious interference with its "prospective business relationships" with all the Millington physicians (as had original Count II), and Count II alleged tortious interference with PHP's existing contractual relations with Dr. Marker who, it was claimed, had now breached his contract with PHP to continue working at Millington.

With the case thus at issue on only the two sets of opposing claims of tortious interference with contractual relationships—PHP essentially claiming that EMSA's threatened enforcement of the restrictive covenant interfered with PHP's efforts to hire two of the

Millington physicians, and EMSA claiming that PHP's efforts to hire those physicians interfered with EMSA's contractual rights to enforce the covenants—things took a somewhat confusing procedural turn. Perceiving that although PHP's claim for declaratory relief had been denied on standing grounds, the issue which that claim sought to raise, that of the covenant's validity, was potentially dispositive of the opposing tort claims that remained in the case, the district court declined to grant either party's pending cross-motions for summary judgment and set the validity issue for an evidentiary hearing. At that hearing, the court received testimonial evidence, both oral and by deposition, and ruled from the bench at its conclusion that the covenant was invalid and unenforceable under Florida law, which controlled under applicable choice of law rules. When the court also ruled as a matter of law that PHP's Count I claim of tortious interference with "prospective business relationships" was not cognizable under Tennessee law, which controlled as to that issue, PHP indicated it would voluntarily dismiss, without prejudice, its remaining Count II claim of tortious interference with its contractual relationships with Dr. Marker, being content with the invalidity ruling respecting EMSA's counterclaim. J.A. 710–25.

On the basis of these developments, the district court then entered an order which granted PHP's "motion for summary judgment" by dismissing EMSA's tortious interference counterclaim; granted EMSA's "motion for summary judgment" by dismissing PHP's Count I claim of tortious interference with prospective business relationships; and dismissed, without prejudice, PHP's Count II tortious interference claim respecting Dr. Marker. J.A. 726.

This appeal by EMSA followed. PHP has not cross-appealed any of the rulings adverse to it, proclaiming itself satisfied with the invalidity ruling upon which the district court based its dismissal of EMSA's counterclaim. Appellee's Br. 9 n. 7.

that their "limitation" periods were two years     rather than one.

## II

The only issue before us, as the parties agree, Appellant's Br. 2; Appellee's Br. 1, is whether the district court erred in ruling that the "limitation on practice" provision in EMSA's contracts with its Millington physician-employees was invalid and unenforceable [2] under Florida law.

That ruling, made after a hearing in which considerable documentary and testimonial evidence was received, was then embodied in an order styled by the court as a grant of "summary judgment" dismissing EMSA's tortious interference counterclaim. J.A. 726. The basis for the ruling was not formally expressed in findings of fact and conclusions of law separately stated, per Fed.R.Civ.P. 52(a), but only orally from the bench in extended colloquy with counsel at the conclusion of the hearing. J.A. 710–25.

■ Although the course of proceedings in the district court had all the trappings of a bench trial on the merits (jury trial not having been requested), it concluded, as indicated, with entry of an order expressly designated by the court as a "summary judgment" dismissing EMSA's counterclaim. Despite this somewhat ambiguous course of proceedings, the parties are agreed (though not without some evident misgivings) that the court's identification of its ruling as one by summary judgment properly defines the process and the ruling it yielded, hence how that ruling should be considered and reviewed on this appeal. *See* Appellant's Br. 2; Appellee's Br. 2, 3. We agree with this assessment. Though not usually appropriate, it is permissible practice to conduct evidentiary hearings in preparation for ruling on summary judgment motions. *See generally* 10A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure: Civil* § 2723 (1983) [hereinafter *Wright, Miller & Kane* ]. The fact that cross-motions had earlier been denied on the basis of the record then before the court did not preclude a later grant on the more fully-developed record produced by the evidentiary hearing. And although both the parties and the district court indicated a perception that findings of fact and conclusions of law were in order to accompany the court's orally announced decision, *see* J.A. 723–24, such a perception does not dictate that the proceeding was actually a bench trial. Though "findings of fact and conclusions of law" are not required in conjunction with the grant of summary judgment, as they are for bench trial judgments, *see* Fed.R.Civ.P. 52(a), "findings" and "conclusions" in a special sense appropriate to the summary judgment process frequently are made for the record and, indeed, are encouraged as aids to effective appellate review. *See* 10 *Wright, Miller & Kane,* § 2716, at 647–50.[3] The references to

---

2. By "invalid and unenforceable" here and in other contexts we do not of course mean "generally invalid and unenforceable" but only invalid and unenforceable in the single respect in which EMSA sought their enforcement in this litigation: to enjoin the Millington physicians from continuing to work at the Millington facility under contracts with PHP. Not before us is any question of their validity and enforceability against others or against the Millington physicians in other ways, either under the express terms of the covenants or by the judicial "blue-penciling" permitted by Florida law. *See, e.g., Flammer v. Patton,* 245 So.2d 854, 859 (Fla.1971).

3. In authorizing and encouraging "findings of fact" (as well as conclusions of law) in connection with grants of summary judgment, courts obviously are using the term in a sense different from that used to describe "findings" that resolve disputed factual issues. By definition, no findings of material facts that were "in genuine issue" are possible in granting summary judgment. *See Rachal v. Hill,* 435 F.2d 59, 65 (5th Cir. 1970), *cert. denied,* 403 U.S. 904, 91 S.Ct. 2203,

29 L.Ed.2d 680 (1971). What is proper, however, and properly encouraged, are "findings" in the different sense of material facts "found" by the court (actually, as a matter of law) to be *not* in genuine issue, hence to provide the basis for entry of summary judgment under Rule 56.

In the instant case, the district court declined upon inquiry to make detailed "findings"—by which we assume it had in mind only the sort proper here—and to rely instead on its oral ruling from the bench as sufficiently embodying the necessary "findings." *See* J.A. 724.

We observe that more detailed "findings" of the proper sort would have been of great helpfulness here—both to the parties in arguing this appeal and to us in reviewing the judgment appealed. That such "findings" were not provided does not of course prevent our inferring them as implicit in the court's oral statement of reasons for its invalidity ruling. *Cf. Gupta v. East Tex. State Univ.,* 654 F.2d 411, 415 (5th Cir.1981) (though findings of fact following bench trial "scanty", sufficiently inferable from "reading the record.")

their need here may properly be taken to reflect that special sense in view of the parties' agreement on the nature of the proceeding.

Accordingly, we review the ruling of invalidity as one entered by summary judgment. That means that we review it *de novo*, applying the same standard as did the district court: whether there was on the record before that court any genuine issue of material fact and, if not, whether on the material facts not in genuine issue, PHP was entitled to judgment as a matter of law. *Jackson v. Kimel*, 992 F.2d 1318, 1322 (4th Cir.1993). And in applying that standard, we are not restricted to the basis upon which the district court made its ruling, but may affirm on any legal and factual basis fairly presented in the district court and preserved for review. *Id.*

### III

■ There is no dispute that, as the district court held, Florida law controls on the issue of the validity of the "limitation on practice" covenants. Appellant's Br. 12–15; Appellee's Br. 19.[4] Nor is there any dispute that if the covenants are invalid under Florida law, their invalidity defeats EMSA's tortious interference counterclaim. *Id.*

We therefore look, as did the district court, to Florida law to determine that potentially dispositive issue. That law is found in two sources: the Florida statute which in typical modern fashion modifies the general common law rule under which such covenants were unenforceable as illegal restraints of trade to allow them under specified conditions, and Florida decisional law interpreting and applying that statute.

The statute is Fla.Stat.Ann. § 542.33 (Supp.1991) which, in relevant part, provides:

one who is employed as an ... employee may agree with his employer to refrain from carrying on or engaging in a similar business and from soliciting old customers of such employer within a reasonably limited time and area, ... so long as such employer, continues to carry on a like business therein. Said agreements may, in the discretion of a court of competent jurisdiction, be enforced by injunction. However, the court shall not enter an injunction contrary to the public health, safety, or welfare or in any case where the injunction enforces an unreasonable covenant not to compete or where there is no showing of irreparable injury.

Predictably, the parties disagree over both the plain meanings that can be found in this portion of the statute's text, and in the interpretation that Florida courts have put upon those parts whose meanings are not that plain.

There is no dispute, however, as to the identity of the statute's essential elements as that can be derived from a literal parsing of its language. So parsed, and paraphrased, it provides that: (1) An employee's otherwise valid covenant not to compete in any capacity with his employer is a legally valid restraint on trade that (2) is judicially enforceable, in the court's discretion by injunction (3) during the term of his/her employment and for a reasonably limited time thereafter, and (4) within a reasonably limited geographical area surrounding the place of employment, (5) for so long as the employer "continues to carry on a like business therein," provided, however, (6) that such a covenant shall not be enforced by injunction if to do so would be contrary to the public interest, or if the covenant is unreasonable, or unless irrepara-

4. Specifically, the district court properly held that (1) Virginia law, including its choice of law rules, controlled decision in this diversity case, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); (2) under Virginia's tort choice of law rule, the law of Tennessee, where the tortious interference alleged by EMSA occurred, governed on that tort claim, *McMillan v. McMillan*, 219 Va. 1127, 253 S.E.2d 662, 663 (1979); (3) under Tennessee tort law, the validity of the covenant is an essential element of EMSA's claim, *Dynamic Motel Management, Inc. v. Er-* *win*, 528 S.W.2d 819, 822 (Tenn.Ct.App.1975); (4) Tennessee, like Virginia, would apply the law of Florida, where the contract was executed, to resolve that issue, *Koehler v. Cummings*, 380 F.Supp. 1294, 1302–03 (M.D.Tenn.1974), both as a matter of both states' common law and because of a valid choice of law provision in the employment contracts; and (5) if under Florida law the covenant was invalid, this would defeat EMSA's tortious interference claim without any need to address the claim's other essential elements. *Finchum Steel Erection Corp. v. Local Union 384*, 202 Tenn. 580, 308 S.W.2d 381, 383 (Tenn.1957).

ble harm (presumed where trade secrets or customer lists are used or existing customers solicited) is shown by the employer. The first five elements have been in the statute since its original enactment (in a predecessor form) in 1953. Element (6) was added by amendment effective June, 1990, to make specific the courts' authority to employ "traditional equitable principles" in deciding whether covenants that met the time and area and like-business requirements should nevertheless not be enforced because of "unfair or unjust results." *Hapney v. Central Garage, Inc.*, 579 So.2d 127, 133 (Fla.Dist.Ct. App.), *review denied*, 591 So.2d 180 (Fla. 1991).[5]

We therefore conclude that under the express terms of Fla.Stat.Ann. § 542.33 (Supp. 1991), the ongoing validity and enforceability of the non-compete covenants, as sought to be enforced here, require at least that they be subject to reasonable time and area limits and that the employer be still in a like business in the protected area, reserving the question whether they must also protect a "legitimate business interest" of the employer.

We agree with the district court that the durational limits expressed in the covenants are not, standing alone, so unreasonable as to invalidate the covenants. J.A. 711. Florida courts consistently have upheld generally comparable limits. *See, e.g., Akey v. Murphy*, 238 So.2d 94, 97 (Fla.1970) (two year period "generally upheld as reasonable").

The reasonable area and "like business" conditions are in one critical respect interrelated and may therefore need, as they do in this case, to be construed together in specific applications. Together they say to employers: you can enforce a non-compete covenant (assuming it's otherwise valid) if the enforcement is sought within a reasonably limited geographical area *and* if you're still carrying on a "like business" in *that* area. The word "therein" is the statutory connector that links the two. Its obvious function is to ensure that enforcement of the covenant is truly aimed at preventing unfair competition by a former employer and not at accomplishing some other impermissible restraint on trade affecting that employee. Only if the employer is still in business in the protected area could enforcement serve that only permissible function.

Applying these two requirements in tandem, it is therefore possible that a particular covenant could be unenforceable simply because the geographic reach required to enforce it against a former employee is unreasonable in scope. Even if it doesn't fail on this basis, it may yet fail because the employer isn't still in a "like business" in that otherwise reasonably limited area. If it isn't still in that business, the employee can't actually be in competition with the employer in that area, and the covenant doesn't therefore now qualify as a statutorily permitted restraint of trade. *See Miller Mechanical, Inc. v. Ruth*, 300 So.2d 11, 12 (Fla.1974) (statute "is designed to allow employers to prevent their employees and agents from learning

**5.** The *Hapney* decision, by a split panel of Florida's intermediate appellate court for the Second District, found implicit in the statute another condition to covenant enforceability not literally expressed: the existence of a "legitimate business interest" in the employer that the covenant protects. The critical effect of such a requirement would be to disallow covenants that protect only against "competition *per se*", i.e., that did no more than meet the basic durational, area, and "like business" requirements. *See Hapney*, 579 So.2d at 130–31. There apparently is a split of authority on this specific question among the Florida intermediate appellate courts, *see Chandra v. Gadodia*, 610 So.2d 15 (Fla.Dist.Ct.App. 1992), *review denied*, 621 So.2d 432 (Fla.1993) (contra), that the Florida Supreme Court has not directly addressed.

Though the parties have argued the issue and its application here extensively, and though the district court based its decision in part on its conclusion that the requirement exists and was not met here, *see* J.A. 711–12, we decline to address it. As will appear, we believe the covenants were unenforceable against the Millington physicians in the way asserted by EMSA whether or not such an additional requirement is implicit in the statute. Accordingly, we avoid addressing this potentially critical, unresolved interpretive issue of Florida statutory law, but note in passing that two federal district courts required to address it have accepted the *Hapney* court's interpretation. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hagerty*, 808 F.Supp. 1555 (S.D.Fla.1992), *aff'd*, 2 F.3d 405 (11th Cir.1993); *MedX, Inc. v. Ranger*, 788 F.Supp. 288, 290–91 (E.D.La.1992).

their trade secrets, befriending their customers and then moving into competition with them").

The district court flatly held, as a matter of law, that the covenant here was "overbroad," hence unenforceable, because it failed to place any reasonable (indeed *any*) limit on the area of its intended coverage. *See* J.A. 711 ("no mention of area"; "no limitation as far as area is concerned"). That technically would have sufficed, standing alone, to hold the covenant invalid without need for further inquiry into the "like business," requirement, and this may have been the court's view of things. But there are intimations that the court also looked to the "continue to carry on a like business" requirement on the alternative assumption that the covenant's restrictions could be considered to involve area limits narrowly defined by those facilities presently served by EMSA. *See* J.A. 711. The court seemed then to conclude that if area limits could be so found, and as such were reasonable ones, the covenant would still be unenforceable on the alternative basis that within that area—here the Millington facility—EMSA was no longer carrying on a like business, having lost the contract and moved out. *See id.* ("There just isn't any competition in Millington, Tennessee. EMSA isn't operating anywhere close").

We agree with the district court's ultimate perception that in the end, however one views the area limits it embodies, this covenant would have been unenforceable by EMSA against the Millington physicians under Florida law. We arrive at that result, however, by a somewhat different and a more narrow route. We hold, as a matter of law on facts not in genuine issue, that (1) the covenant does contain area limits; it doesn't purport to be geographically unbounded; (2) those "area" limits are narrowly the specific facilities in which by the covenant's terms competitive activity is prohibited; (3) as sought to be applied here, that area would be the Millington facility; and (4) in that facility EMSA was not any longer at the time in issue carrying on a "like business" within the meaning of the Florida statute.

In so holding, we agree preliminarily with EMSA that its covenant is not (as the district court opined) geographically unbounded, that instead it is bounded in its geographical reach to specific facilities where it provides medical services, and that as so identified, these area limits are reasonable ones. Appellant's Main Br. 29–32. But winning this point in the end cuts against EMSA for, as indicated, the Florida statute then requires that to enforce its covenant in any such facility-limited "area" EMSA must still be carrying on a "like business therein"—here, in the Millington facility. Faced with this catch–22 aspect of the matter, EMSA attempts to avoid the plain fact that it is no longer carrying on its former business of providing emergency medical services in the Millington facility by contending for a definition of "like business" broader than the actual provision of those services. Its business, says EMSA, includes not just providing services but marketing its services. And, says EMSA, it was still carrying on—indeed never ceases—its efforts to market its services at Millington and, presumably, every other Defense Department medical facility in the country which contracts for services it provides. Appellant's Main Br. 33–36.

This is a valiant effort, but it must fail. The question is not, of course, whether for many purposes EMSA's "business" must be thought to include its efforts to market its services as well as provide them. Obviously for many purposes it must be: all enterprises providing goods or services have this as a major part of their "business" in a general sense. The question here, though, is narrowly whether "like business" in the Florida statute was intended to include such marketing efforts. We've been directed to no Florida authority on the question, but we believe the answer is plain as a matter of plain meaning statutory interpretation and simple logic. The narrow aim of the statute is to allow employers to protect themselves, within reasonable bounds of time and area, from competition with former employees who become unfairly engaged in the protected area in the same business in which the employer continues "therein" to be engaged. *See Miller Mechanical, Inc.,* 300 So.2d at 12. We can't believe that the Florida courts would

interpret the "like business" provision in a way that would allow an employer who has completely gone out of the specific business its covenant was designed to protect against competition in a defined area,[6] to continue nevertheless to enforce the covenant in that area on the basis that he was making efforts to re-establish his business there. The obvious mischief of such a rule, and the impossibility of keeping it properly bounded, sufficiently demonstrate its unacceptability. It would effectively write out the basic competition premise upon which these non-compete covenants are allowed despite their restraints of trade.

We hold therefore that "like business" as applied here refers only to the continued provision of emergency medical services at the Millington facility, a business that at the critical time EMSA was not still "carrying on."[7] Because this is a critical condition to the covenant's enforceability against the Millington physicians, this determination is dispositive on that issue and requires affirmance of the district court's dismissal of the EMSA counterclaim.[8]

*AFFIRMED.*

---

**6.** It's of course possible that the language of a particular covenant might raise significant questions about the scope of the "specific business" it seeks to protect against competition, hence of the "like" business whose continuation by the employer would entitle it to enforce the covenant under the Florida statute. Theoretically, the contractually defined protection might extend to marketing endeavors to restore lost or abandoned service contracts, though it's hard to imagine. But there's no such problem here. The EMSA covenant specifically defines the "business" the former employee can't do, hence by necessary implication the "like business" which, per the Florida statute, EMSA must still be doing in order to enforce the covenant, and that business is only the "provi[sion] of any similar form of medical services or consulting or staff services at any client facility...." *See* note 1, supra. The covenant's definition of the "business" prohibited to the employee thus unambiguously defines the "like business" whose continuation by the employer is required by the Florida statute—and it doesn't include marketing those services after their provision by the employer has, for any reason, ceased.

**7.** As indicated, *see* note 2 *supra,* such a holding by no means invalidates this covenant for all its stated and implicit purposes. For example, it does not touch its enforceability during the period of an employee's employment contract, nor at any EMSA facility at which EMSA still is under contract to provide comparable services.

**8.** Our conclusion that enforceability is defeated on this basis alone makes it unnecessary, as earlier indicated, *see* note 5 *supra,* to review the district court's further ruling that it was also defeated because of the absence of any "legitimate business interest" that the covenant protected. This was the issue to which the evidentiary hearing was principally devoted, as EMSA sought to establish its recruitment and training expenses as the business interest legitimately protected. Avoidance of that issue also avoids any need to consider whether the evidentiary hearing developed any genuine issues of material fact respecting that theory.