**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ADVENTURE COMMUNICATIONS,
INCORPORATED, a West Virginia
corporation; GATEWAY
COMMUNICATIONS, INCORPORATED, a
Delaware corporation; HARVIT
BROADCASTING CORPORATION, a West
Virginia corporation; HERITAGE
MEDIA, INCORPORATED, a Delaware
corporation; LEE ENTERPRISES,
INCORPORATED, a Delaware
corporation; SULLIVAN
BROADCASTING OF WEST VIRGINIA,
INCORPORATED, a Delaware
corporation,
Plaintiff-Appellees,

v.

No. 98-2778

KENTUCKY REGISTRY OF ELECTION
FINANCE,
Defendant-Appellant,

ILLINOIS BROADCASTERS ASSOCIATION;
INDIANA BROADCASTERS ASSOCIATION;
MISSOURI BROADCASTERS
ASSOCIATION; OHIO ASSOCIATION OF
BROADCASTERS; TENNESSEE
ASSOCIATION OF BROADCASTERS; THE
WEST VIRGINIA BROADCASTERS
ASSOCIATION; KEN HECKLER,
Secretary of the State of West
Virginia; COMMON CAUSE OF
KENTUCKY AND WEST VIRGINIA,
Parties in Interest.

Appeal from the United States District Court
for the Southern District of West Virginia, at Huntington.
Joseph Robert Goodwin, District Judge.
(CA-96-938-3)

Argued: May 6, 1999

Decided: September 9, 1999

Before WILKINSON, Chief Judge, and TRAXLER
and KING, Circuit Judges.

_____

Reversed by published opinion. Judge Traxler wrote the opinion, in
which Chief Judge Wilkinson and Judge King joined.

_____

**COUNSEL**

**ARGUED:** Sheryl G. Snyder, BROWN, TODD & HEYBURN,
P.L.L.C., Louisville, Kentucky, for Appellant. David Allen Barnette,
JACKSON & KELLY, P.L.L.C., Charleston, West Virginia, for
Appellees. **ON BRIEF:** Ancil G. Ramey, George E. Carenbauer,
STEPTOE & JOHNSON, Charleston, West Virginia, for Appellant.

_____

**OPINION**

TRAXLER, Circuit Judge:

At issue in this appeal is a Kentucky statute imposing reporting
requirements upon broadcast media that sell advertising time to Ken-
tucky gubernatorial candidates. The sweep of the statutory scheme
encompasses appellees -- a number of nonresident television and
radio broadcasters located in West Virginia (collectively "Broadcast-
ers"). We are presented with the question of whether the Kentucky
reporting requirements may be applied to the West Virginia Broad-
casters within the constraints of the Due Process Clause of the Four-

2

teenth Amendment and the Free Speech Clause of the First Amendment. We conclude that the statutory provisions at issue do not offend the Constitution.

I.

During the past decade, the Commonwealth of Kentucky has suffered a number of high-profile political campaign scandals, culminating in the indictment of various public officials and lobbyists. In 1992, in an effort to curb further corruption, Kentucky passed extensive campaign finance reform legislation, see Ky. Rev. Stat. Ann. § 121A.005-.990 (Michie 1993 & Supp. 1999), featuring a provision establishing partial public funding for qualifying slates of candidates seeking the office of governor or lieutenant governor, see Ky. Rev. Stat. Ann. §§ 121A.020, 121A.080. The public-funding provision operates on a quid pro quo basis: a slate of candidates must agree to a total campaign spending cap of $1.8 million, including public funds received by the candidates, per primary or general election in order to qualify for public financing. See Ky. Rev. Stat. Ann. §§ 121A.010(5), 121A.030. Kentucky will match two dollars for every one dollar in private donations raised by a qualifying slate of candidates, see Ky. Rev. Stat. Ann. § 121A.060(3)(c), with the provision that the slate accept no more than $600,000 in private donations per election, see Ky. Rev. Stat. Ann. § 121A.060(1).

In order to police compliance with the spending limit, Kentucky enacted a number of reporting requirements as part of its reform legislation. See 1992 Ky. Acts, ch. 288, § 28.[1] Candidates for governor and lieutenant governor, along with their campaign committees and treasurers, are required to report all expenditures and contributions to the Kentucky Registry of Election Finance (the "Registry"). See Ky. Rev. Stat. Ann. § 121.180(3)(a) (Michie Supp. 1998). Likewise, fundraisers are required to report contributions received and expenditures made on behalf of gubernatorial candidates. See id. Political action

_____

[1] Prior to 1992, Kentucky's existing campaign finance laws imposed various reporting requirements upon the candidates and their committees; however, the reform legislation in 1992 overhauled the reporting scheme and included additional groups and individuals within its scope. See 1992 Ky. Acts, ch. 288, § 28.

committees, too, are obliged to report expenditures made "for a communication which expressly advocates the election or defeat of a clearly identified candidate or slate of candidates ...." Ky. Rev. Stat. Ann. § 121.015(12) (Michie Supp. 1998); see Ky. Rev. Stat. Ann. § 121.180(6)(d) (Michie Supp. 1998).

Of particular import here is a requirement mandating that all major advertising media report certain information regarding their sales of advertising spots to gubernatorial candidates. See Ky. Rev. Stat. Ann. § 121.180(11) (Michie Supp. 1998). Newspaper and magazine publishers must "file with the registry a copy of the material or communication purchased which supports or opposes any slate of candidates ...; a copy of the receipt for the funds paid; the name and address of each purchaser; and the source of the funds for the purchase if different than the purchaser." Ky. Rev. Stat. Ann.§ 121.180(11)(a). This requirement also applies to "any other person, company, corporation, or business organization offering its communications or advertising services for hire to the public." Id.

Television and radio stations are subject to other, arguably less onerous, reporting requirements than the print media, having to file with the Registry only "a copy of the documentation of paid political campaign advertisements that is required to be maintained by the Federal Communications Commission, along with a cover letter from the manager of the station or network or the manager's designee." Ky. Rev. Stat. Ann. § 121.180(11)(b).[2]  A noncomplying radio or televi-

_____

2 The FCC requires that television and radio stations maintain certain basic information relating to political campaign advertisements:

> (a) [The stations must] keep and permit public inspection of a complete and orderly record (political file) of all requests for broadcast time made by or on behalf of a candidate for public office, together with an appropriate notation showing the disposition made by the licensee of such requests, and the charges made, if any, if the request is granted. The "disposition" includes the schedule of time purchased, when spots actually aired, the rates charged, and the classes of time purchased.
>
> ...
>
> (c) All records required by this paragraph shall be placed in the political file as soon as possible and shall be retained for a period

4

sion station is subject to a civil penalty of up to $5,000. See Ky. Rev. Stat. Ann. §§ 121.140(2), 121.180(11)(e). The report must be mailed to the Registry no later than 30 days after the election. See Ky. Rev. Stat. Ann. § 121.180(11)(c). According to the Registry, the purpose of requiring the media to file reports is to ensure that Kentucky has independent information with which to verify the media expenditure reports from the candidates.[3]

The Broadcasters operate television and radio stations located within the Charleston-Huntington, West Virginia television "Dominant Market Area" (DMA), which consists of 16 counties in West Virginia, 12 counties in Kentucky, and 7 counties in Ohio. Approximately 25% of the households within the DMA are located in Kentucky. The Broadcasters routinely cover news stories originating from Kentucky, including statewide elections and local elections in eastern Kentucky. Not surprisingly, then, the Broadcasters solicit potential sponsors from the 12 Kentucky counties within the Charleston-Huntington DMA through sales agents operating inside of Kentucky. The Broadcasters do not dispute that they derive substantial advertising revenue from sponsors located in Kentucky.

In 1995, Kentucky held its primary and general elections for the first time under the new campaign spending and reporting provisions. Because the Broadcasters service a large part of eastern Kentucky, statewide candidates purchased advertising time from these stations as they had done during previous elections. All told, the Broadcasters received $267,202 in revenue from candidates for governor and lieutenant governor during the 1995 primary and general elections. At the conclusion of the elections, however, when they failed to comply fully with the reporting requirements, the Registry sent written demands for compliance, in certain instances referencing the potentially applicable penalties.[3]

_____

  of two years. As soon as possible means immediately absent unusual circumstances.

47 C.F.R. § 73.1943 (1998).

[3] When originally enacted, and at the time of the 1995 elections, § 121.180(11) required television and radio broadcasters to file the same information as the print media: a copy of the political advertisement; a

In September 1996, the Broadcasters filed this action for declaratory and injunctive relief, raising several constitutional claims. Among these were the two contentions we consider on appeal: that Kentucky's attempt to enforce its reporting requirements against them was an extra-territorial application of state law for which Kentucky had no jurisdiction, abridging their due process rights, and that Kentucky's application of the reporting requirements to members of the broadcast media had a chilling effect on commercial speech.

The district court concluded "that the Kentucky statutory scheme, if applied to the [Broadcasters], would improperly extend the Commonwealth's sovereign power beyond its territorial boundaries" and that "Kentucky lacks the legislative power to apply Section 121.180(11) of the Kentucky Revised Statutes to the[Broadcasters]." J.A. 363-64. Having decided that Kentucky could not, consistent with due process, enforce the statute against the Broadcasters, the district court did not address the Broadcasters' First Amendment claim.**4** The Registry appealed.

_____

receipt showing the amount of funds paid for the advertisement; the identity of the purchaser of the advertisement; and the source of the funds for the advertisement if not identical to the purchaser. See Ky. Rev. Stat. Ann. § 121.180(11) (Michie 1993). Also, at the time of the 1995 elections, the statute imposed both civil and criminal sanctions for violations of the reporting requirements. See Ky. Rev. Stat. Ann. §§ 121.990, 121A.990 (Michie 1993).

In 1996, Kentucky's General Assembly eliminated the criminal penalties for violating the reporting requirements. See Ky. Stat. Ann. §§ 121.140(2), 121.180(11)(e) (Michie Supp. 1998). And, in 1998, the General Assembly loosened the reporting requirements that Kentucky applied to over-the-air broadcasters such that television and radio stations are now required to submit to the Registry only a copy of their FCC report along with a cover letter. See Ky. Rev. Stat. Ann. § 121.180(11)(b) (Michie Supp. 1998). Despite these amendments, which occurred during the pendency of this case, the Broadcasters continue their attack against the current version of the statute, and the parties agree that it is only this version which is at issue.

**4** The Broadcasters also asserted that Kentucky's reporting scheme unduly burdened interstate commerce in violation of the Dormant Commerce Clause and that the reporting requirements impermissibly restricted the Broadcasters' fundamental right to free speech in violation of the Equal Protection Clause. The district court, however, did not address these claims, and the Broadcasters do not advance them here.

## II.

Relying on the general principle that a state's legislative jurisdiction is restricted to "its territorial limits, and its laws have no operation in other states except as allowed by those states or by comity," Stover v. O'Connell Assoc., Inc., 84 F.3d 132, 136 (4th Cir. 1996), the district court concluded that Ky. Rev. Stat. Ann.§ 121.180(11)(b) cannot constitutionally be applied to the Broadcasters because the conduct sought to be regulated, when viewed precisely, occurred wholly outside of Kentucky's borders. In the district court's view, since the Broadcasters' actual conduct, consisting of reproducing their FCC files and placing the copies in the United States mail, technically occurred in West Virginia, such was not subject to control by Kentucky. In so concluding, the district court noted the distinction between legislative and adjudicative jurisdiction, and rejected any suggestion that the familiar "minimum contacts" analysis developed to determine whether a state can assert judicial jurisdiction over a person applied in this context. See Quill Corp. v. North Dakota, 504 U.S. 298, 319-20 (1992) (Scalia, J., concurring) (observing that adjudicative jurisdiction and legislative jurisdiction are distinct concepts). The district court apparently concluded that the Broadcasters' contacts with Kentucky, regardless of their number, were irrelevant to determining legislative jurisdiction, and that the analysis should instead focus exclusively on whether the physical activity purportedly being regulated occurred within Kentucky's borders or caused harm there.[5]

_____

[5] We cannot help but conclude that the district court's analysis was based largely on the assumption that the Kentucky statute at issue was essentially a criminal statute and that, as a result, the issue was really whether Kentucky has the power to criminalize conduct occurring wholly outside of its territorial boundaries. Indeed, the district court explained that "[d]espite the frequency of the [Broadcasters'] contacts with Kentucky ... Kentucky simply does not have the legislative authority to require a West Virginia citizen to comport with Kentucky's criminal laws when conducting activity that occurs totally outside the Commonwealth." J.A. 376. As we noted, however, Kentucky has eliminated the criminal penalties for failing to file a report under its statute, and the Broadcasters' challenge is limited to the Kentucky statute in its current form. Neither party suggests that the penalties for failure to comply with § 121.180(11) are criminal in nature.

7

The Registry argues that where the Broadcasters prepare the report is less important than the relationship between the Broadcasters and the Commonwealth of Kentucky. Although the Registry does not suggest that we apply a minimum contacts analysis, it contends that the Broadcasters' aggregate contacts with Kentucky are indeed relevant and are substantial enough that it is not fundamentally unfair to subject them to the Kentucky statute.

A.

The district court correctly observed that there is a difference between jurisdiction to adjudicate or judicial jurisdiction on the one hand, and legislative jurisdiction on the other. See generally Willis L.M. Reese, Legislative Jurisdiction, 78 Colum. L. Rev. 1587, 1587-94 (1978). The former concerns the power of a state to resolve a particular dispute through its court system, while the latter involves "the authority of a state to make its law applicable to persons or activities." Hartford Fire Ins. Co. v. California, 509 U.S. 764, 813 (1993) (internal quotation marks omitted) (Scalia, J., dissenting). Legislative jurisdiction is a core concept "to determining the extraterritorial reach of a statute." Id. To put it succinctly: Legislative jurisdiction refers to both "the lawmaking power of a state" and "the power of a state to apply its laws to any given set of facts," whereas adjudicative jurisdiction "is the power of a state to try a particular action in its courts." McCluney v. Jos. Schlitz Brewing Co., 649 F.2d 578, 581 n.3 (8th Cir. 1981) (emphasis in original), aff'd, 454 U.S. 1071 (1981).

Nevertheless, the concepts are closely related. A state's adjudicative jurisdiction is circumscribed by the due process clause, see Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., 480 U.S. 102, 113 (1987) (state may not exercise judicial jurisdiction over a person if to do so would run afoul of "traditional notions of fair play and substantial justice" (internal quotation marks omitted)), as is its legislative jurisdiction, see Allstate Ins. Co. v. Hague, 449 U.S. 302, 312-13 (1981) (state may not apply its substantive law if to do so would be fundamentally unfair).[6]

_____

[6] Another traditional constitutional source of restriction on a state's power to apply its law beyond its borders is the full faith and credit clause. See Hague, 449 U.S. at 308 n.10. Here, however, the Broadcasters' challenge is limited to whether the Kentucky statute, as applied to them, exceeds the constraints of the due process clause.

8

Moreover, there is substantial overlap in the analysis employed in determining the presence of each kind of jurisdiction. The standard for deciding whether a court may exercise adjudicative jurisdiction over a defendant, established by International Shoe Co. v. Washington, 326 U.S. 310 (1945), and its progeny, is well-recognized: Does the defendant "have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Id. at 316 (internal quotation marks omitted).

In exploring the due process limits on the legislative power of a state, the Supreme Court has employed language similar to that used in personal jurisdiction matters, explaining that"[t]here must be at least some minimal contact between a State and the regulated subject before it can, consistently with the requirements of due process, exercise legislative jurisdiction." Hellenic Lines Ltd. v. Rhoditis, 398 U.S. 306, 314 n.2 (1970) (emphasis added); see also McCluney, 649 F.2d at 581 (noting that until Hague "it was unclear whether the due process limitation upon a state's extraterritorial application of law mirrored the due process analysis for determining the limits of a state court's judicial jurisdiction"). Thus, we conclude the idea of "contacts" between the Broadcasters and Kentucky to be of great significance -- indeed, primary significance -- when analyzing legislative jurisdiction. To this end, the Supreme Court's conflict-of-laws jurisprudence provides a useful guide.

In Home Ins. Co. v. Dick, 281 U.S. 397, 407-10 (1930), the Court concluded that a Texas insurance statute could not be applied, consistent with the due process clause, to invalidate a provision contained in an insurance policy that had been issued in Mexico and was to be performed in Mexico. In so holding, the Court examined the contacts between the activity Texas purported to regulate-- the making of the insurance contract -- and the State of Texas. See id. at 407-08. Finding none that were substantial, the Court concluded that Texas was without power to apply its law to alter the insurance contract, and that to do so amounted to a due process violation. See id. at 408. Likewise, in John Hancock Mut. Life Ins. Co. v. Yates, 299 U.S. 178, 182 (1936), the Court again examined the relationship between the transaction to be regulated and the state by applying the precept that the Constitution does not permit a state to apply its law when the contacts

9

between it and the transaction are too attenuated. See Hague, 449 U.S. at 310-11 ("Dick and Yates stand for the proposition that if a State has only an insignificant contact with the parties and the occurrence or transaction, application of its law is unconstitutional." (emphasis added)).

In Hague, the Court provided a concise test for the exercise of legislative jurisdiction: "[F]or a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that [application] of its law is neither arbitrary nor fundamentally unfair." Hague, 449 U.S. at 312-13; see Thornton v. Cessna Aircraft Co., 886 F.2d 85, 89 (4th Cir. 1989) (applying Hague).

This standard is not too different from the gauge used by the Court in evaluating a state's jurisdiction to tax various activities of nonresidents. A state possesses the power to impose a tax upon an out-of-state entity only when there is a "nexus between the taxing State and the taxpayer," i.e., "some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax." American Oil Co. v. Neill, 380 U.S. 451, 458 (1965) (emphasis added) (internal quotation marks omitted). It is clear, however, that there can be sufficient contacts between the taxing state and the person or transaction to be taxed to satisfy due process even though the transaction does not physically transpire within the state's borders or the person is not physically present there. See Quill, 504 U.S. at 308 (holding that North Dakota could impose a use tax upon an out-of-state mail-order vendor within the constraints of due process even though the vendor lacked a physical presence in North Dakota).**7** Due process requires simply that the taxpayer "purposefully direct[ ] its

_____

**7** In declining to find that due process requires an entity to have a physical presence within a state before it is subject to the state's jurisdiction to levy a use tax, the Quill majority overruled National Bella Hess, Inc. v. Department of Revenue, 386 U.S. 753 (1967), to the extent it held the due process clause imposed such a requirement. Significantly, it found that the analysis in Bella Hess was no longer viable in light of the court's development of a less rigid approach to a state's adjudicative jurisdiction. See Quill, 504 U.S. at 307.

10

activities" at the taxing state and develop sufficient contacts there such that the imposition of the tax is not unfair. Id. And, a state's power to extend its regulatory jurisdiction beyond its borders likewise hinges on much the same reasoning. See Travelers Health Ass'n v. Virginia, 339 U.S. 643, 648 (1950) ("[T]he contacts and ties of appellants with Virginia residents, together with that state's interest in faithful observance of [the statutory scheme it sought to apply to appellants], justify subjecting appellants to[administrative] proceedings.").

In sum, although not identical, judicial and legislative jurisdiction are determined pursuant to like guidelines. As Justice Brennan explained:

> [B]oth inquiries are often closely related and to a substantial degree depend upon similar considerations. In either case an important linchpin is the extent of contacts between the controversy, the parties, and the forum State. While constitutional limitations on the choice of law are by no means settled, important considerations certainly include the expectancies of the parties and the fairness of governing the defendants' acts and behavior by rules of conduct created by a given jurisdiction. These same factors bear upon the propriety of a State's exercising jurisdiction over a legal dispute. At the minimum, the decision that it is fair to bind a defendant by a State's laws and rules should prove to be highly relevant to the fairness of permitting that same State to accept jurisdiction for adjudicating the controversy.

Shaffer v. Heitner, 433 U.S. 186, 224-25 (1977) (Brennan, J., concurring and dissenting) (internal quotation marks and citations omitted); see also Hague, 449 U.S. at 317 n.23 (noting that the existence of personal jurisdiction is a significant factor in determining whether the application of a state's substantive law is constitutional). Blending these guiding precedents, we must determine whether there are sufficient contacts between Kentucky and the Broadcasters, or the Broadcasters' activities that Kentucky seeks to affect, creating state interests such that it would not be fundamentally unfair to subject the Broadcasters to the Kentucky campaign reporting requirements.

11

B.

The contacts between the Broadcasters and Kentucky are substantial and pervasive. The Broadcasters' West Virginia stations are all located within the Charleston-Huntington DMA, which is comprised of a total of 35 counties in three states -- including 12 counties in eastern Kentucky. Thus, the Broadcasters' telecasts and radio broadcasts are directed toward eastern Kentucky and its citizens. A full one-fourth of the households receiving these telecasts are located in Kentucky. And, the Broadcasters maintain written retransmission consent agreements with cable television systems whose subscribers live in Kentucky. All of the Broadcasters, save one, provide regular coverage of news developments in Kentucky, and some of them transmit live radio broadcasts from various Kentucky businesses advertising on their stations. Most of the Broadcasters employ Kentucky residents and maintain listings in telephone directories published in Kentucky. As a result, the Broadcasters, as a general matter, market advertising slots to potential sponsors residing within Kentucky's portion of the DMA. The Broadcasters market their services in Kentucky in person, by telephone, and by mail. The Broadcasters concede that, collectively, they enjoy substantial revenue generated from Kentucky-based advertisements.

The Broadcasters have direct links with Kentucky's statewide elections as well. Most significantly, they stipulated before the district court that they "solicit business from candidates in statewide electoral contests in Kentucky by marketing directed to the candidates and their agents situated in Kentucky, as well as to the candidates' agents situated outside Kentucky." J.A. 77. And, since the Broadcasters "are the only over-the-air television stations affiliated with the major commercial television networks whose broadcasts reach a significant portion of Eastern Kentucky, candidates for statewide political office in Kentucky routinely purchase advertising time during election campaigns on the [Broadcasters'] stations." J.A. 77. During the 1995 primary and general gubernatorial elections, the Broadcasters received political advertising revenues totaling $267,202.

Also significant is the fact that the majority of the advertising revenue received by the Broadcasters was comprised of Kentucky tax dollars. Because each gubernatorial slate that agreed to cap its campaign

12

spending received public funding of two dollars for every one dollar in private contributions, two-thirds of the revenue received consisted of Kentucky tax money.**8** See Ky. Rev. Stat. Ann. §§ 121A.030, 121A.060.

Furthermore, in view of the fact that a large portion of the substantial advertising revenues received by the Broadcasters was comprised of Kentucky tax dollars, Kentucky had a clear interest in applying its reporting scheme to the Broadcasters. The reporting requirements advance the general statutory goal of stemming corruption and promoting electoral integrity by serving as an additional method to ensure compliance with the spending limits and to verify that Kentucky tax money is put to proper use.

In short, we conclude that the Broadcasters' aggregate contacts with Kentucky, coupled with Kentucky's interest in enforcing its statutory requirements here, were sufficient to satisfy the demands of due process. Thus, we reverse the district court's decision that Kentucky's statutory requirement that television and radio stations provide the Registry with a copy of their FCC political file, see Ky. Rev. Stat. Ann. § 121.180(11), as applied to the Broadcasters, is an improper exercise of legislative jurisdiction in violation of the due process clause.

III.

The Broadcasters advance an alternative basis under the First Amendment for affirming the order of the district court.**9** They con-

_____

**8** We find it of no moment that the advertisements for many of the candidates were placed through out-of-state advertising agencies located in Washington, D.C. and elsewhere. Although the actual physical transactions in these instances may have occurred outside of Kentucky, they had every connection with Kentucky because the transactions involved Kentucky tax revenue expended on behalf of candidates seeking statewide elected office in Kentucky.

**9** In their cross-motion for summary judgment, the Broadcasters argued that the Kentucky reporting statute contravened not only the due process clause, but a number of other constitutional provisions as well, including the First Amendment. The district court did not address the Broadcasters'

13

tend that the statutory reporting requirements impermissibly burden speech under the First Amendment. The Broadcasters would analyze the statute under an intermediate degree of scrutiny that is applied to commercial speech regulations. Kentucky, on the other hand, contends that the reporting requirement merely regulates business transactions, not expressive conduct, and thus does not rouse First Amendment concerns at all. Alternatively, Kentucky argues that even if the statute is construed as regulating expressive conduct, it would also apply an intermediate level of scrutiny, under which the statute passes constitutional muster.

A.

The Supreme Court has established varying degrees of review under the First Amendment, depending upon the extent to which the law being inspected infringes on speech. We are to "apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content." Turner Broad. Sys. v. FCC, 512 U.S. 622, 642 (1994). Content-neutral laws, i.e., "speech regulations ... that are justified without reference to the content of the regulated speech," see City of Renton v. Playtime Theaters, Inc., 475 U.S. 41, 48 (1986) (internal quotation marks omitted) (emphasis in original), have generally been subjected to some form of intermediate scrutiny, see United States v. O'Brien, 391 U.S. 367, 376 (1968) (applying intermediate scrutiny to regulation of conduct containing both speech and nonspeech elements); United States v. Grace, 461 U.S. 171, 177 (1983) (discussing time,

_____

alternative grounds for summary judgment, having concluded that the Broadcasters' due process rights had been abridged. Consequently, the parties did not brief the First Amendment issue. Finding First Amendment grounds as a potential basis for affirming the district court, see PHP Healthcare Corp. v. EMSA Ltd. Partnership, 14 F.3d 941, 945 (4th Cir. 1993) ("[W]e are not restricted to the basis upon which the district court made its ruling, but may affirm on any legal and factual basis fairly presented in the district court...."), we directed the parties, after oral argument, to submit supplemental briefs on the following issue: Does the statute at issue violate the Broadcasters' rights under the First Amendment, either on its face or as applied?

14

place and manner restrictions). Likewise, the regulation of commercial speech is subject to an intermediate degree of scrutiny. See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n, 447 U.S. 557, 566 (1980).

The First Amendment is also implicated when the government regulates the media -- even if speech is not being regulated directly -- because the media engage in the transmission of speech. See Leathers v. Medlock, 499 U.S. 439, 444 (1991). Nevertheless, we are mindful that the broadcast media -- which are involved here -- have historically been subject to more intrusive regulation than the print media. See, e.g., Red Lion Broad. Co. v. FCC, 395 U.S. 367, 387-89 (1969). The underlying reason for allowing greater regulation of the broadcast media is that, given its limited nature, the spectrum of broadcast frequencies is a scarce resource that cannot accommodate every person who desires to project speech over the airwaves, whereas, theoretically, any person so inclined can publish written speech or engage in oral speech. See id. at 388 ("Where there are substantially more individuals who want to broadcast than there are frequencies to allocate, it is idle to posit an unabridgeable First Amendment right to broadcast comparable to the right of every individual to speak, write, or publish."); see also Turner, 512 U.S. at 637-41 (explaining that the scarcity policy basis for regulating the broadcast media does not apply to the cable industry). Accordingly, the Court has typically applied a relaxed form of scrutiny to general regulation of over-the-air broadcasters as opposed to the print media, see, e.g. , Red Lion, 395 U.S. at 387-401, or the cable industry, see Turner , 512 U.S. at 637-40.

Of course, laws that do not touch or concern speech or expressive activity in the first instance do not raise First Amendment concerns, even though they apply to the press, unless they impermissibly single out the media. See Arcara v. Cloud Books, Inc. , 478 U.S. 697, 706-07 (1986). Such laws are subject to heightened scrutiny only if they target or disproportionately burden the press. See Cohen v. Cowles Media Co., 501 U.S. 663, 669-70 (1991). Otherwise, we simply apply a rational basis review. See id.

15

B.

The Kentucky statute does not in any way directly regulate speech or conduct containing an expressive element, and the Broadcasters make no such contention. Thus, the various levels of scrutiny ascribed to content-based or content-neutral regulations of speech are not appropriate here. Rather, the Broadcasters invoke the First Amendment in more of a roundabout fashion. They suggest that the filing requirement imposes significant costs upon them and, as a result, potentially chills commercial speech. Thus, their argument is essentially that the Kentucky statute incidentally burdens commercial speech -- presumably because the Kentucky law requires them to report information relating to advertisements -- and that we must apply at least some level of intermediate scrutiny in testing the validity of the statute under the First Amendment.**10** Specifically, they invite us to apply the four-prong Central Hudson analysis for commercial speech. See 447 U.S. at 566. The Broadcasters claim that the statute fails the Central Hudson test because Kentucky's interest in enforcing the reporting scheme is not sufficiently substantial to justify subjecting them to it and that, even if Kentucky's interest qualifies as substantial, the statutory provision at issue is more restrictive than necessary to serve the asserted governmental interest. We decline to apply Central Hudson because even if the statute incidentally burdens speech -- which the Broadcasters have not demonstrated -- it is not commercial speech.

In the abstract, the definition of commercial speech appears to be fairly straightforward, if somewhat circular: it is speech that "`propose[s] a commercial transaction.'" Board of Trustees v. Fox, 492 U.S. 469, 473 (1989) (quoting Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 762 (1976)); see also Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 66 (1983); Central Hudson, 447 U.S. at 562. In practice, however, application of this definition is not always a simple matter. See generally Alex Koz-

_____

**10** Although the Broadcasters suggest in passing that the Kentucky statute impinges directly upon core political speech (and, by implication, is therefore subject to strict scrutiny), their argument rests almost exclusively on the proposition that intermediate scrutiny applies. In any event, we find no merit in this suggestion.

16

inski & Stuart Banner, Who's Afraid of Commercial Speech, 76 Va. L. Rev. 627 (1990). For instance, that speech is rendered in the form of an advertisement does not necessarily render such speech commercial in nature. See Bolger, 463 U.S. at 66; New York Times Co. v. Sullivan, 376 U.S. 254, 265-66 (1964) (concluding that an advertisement soliciting funds for political and social ends was entitled to more protection than mere commercial speech). Nor does a cursory reference to a particular product necessarily convert into commercial speech that which is otherwise noncommercial. See Bolger, 463 U.S. at 66. In and of itself, profit motive on the speaker's part does not transform noncommercial speech into commercial speech. See id. at 67. Yet, the confluence of these considerations may permit the conclusion that the speech at issue is commercial in nature. See id.

Furthermore, when the speech at issue contains both commercial elements and political or social commentary, the line between commercial and noncommercial speech can be difficult to discern. When these elements are intertwined, the commercial or noncommercial character of the speech is determined by "the nature of the speech taken as a whole." Riley v. National Fed'n of the Blind of North Carolina, Inc., 487 U.S. 781, 796 (1988). Consideration of the full context of the speech is therefore critical. See Bolger, 463 U.S. at 67-68. Thus, if a communication, at bottom, proposes a commercial transaction, the fact that it contains some commentary about issues of public interest will not alter its nature. See Fox, 492 U.S. at 475 ("We have made clear that advertising which links a product to a current public debate is not thereby entitled to the constitutional protection afforded noncommercial speech." (internal quotation marks omitted)).

For purposes of this case, however, we need not ponder the analytical niceties of speech that contains both commercial and noncommercial elements. The general contours of the definition of commercial speech are sufficient for us to discern that the only speech which could possibly be impacted here is not commercial. Rather, we are addressing gubernatorial campaign messages which, generally speaking, fall squarely within the notion of core political speech and are quintessentially noncommercial. The only consideration that gives us pause is the medium of the speech: paid advertisements. However, the mere fact that political speech is delivered in such a fashion, i.e., that "money is spent to project it, as in a paid advertisement," Virginia Bd.

17

of Pharmacy, 425 U.S. at 761, does not taint its otherwise noncommercial nature, see id.; Bolger, 463 U.S. at 66. As the Court has observed, the fact that the press is "paid for publishing the advertisement is immaterial ... as is the fact that newspapers and books are sold." New York Times, 376 U.S. at 266. Far more important is content of the political advertisement. See id.11

We are convinced that the speech which the Broadcasters contend will be impacted by the reporting requirements -- gubernatorial campaign advertisements -- is not speech that "proposes a commercial transaction." Thus, we conclude the application of Central Hudson would be inappropriate here, despite the contentions of the parties.

C.

This issue does not fit neatly under any distinct line of decisions. However, we need not strain to force it into any particular niche because this statute passes muster under any level of scrutiny. Regardless of the level of scrutiny, it is clear that Kentucky selected a narrowly tailored means to further a compelling state interest.

There is really no question that Kentucky is advancing a compelling state interest here: the integrity of its electoral system and the eradication of campaign finance corruption. Cf. Kentucky Right to

_____

11 Although the New York Times decision was rendered prior to Virginia State Bd. of Pharmacy, 425 U.S. 748, which first granted limited constitutional protection to "commercial speech" as we now understand that term, it is nevertheless instructive on the essence of commercial speech. In New York Times, the court considered the nature of a newspaper advertisement which, among other things, solicited funds for the defense of Dr. Martin Luther King against a perjury charge and in support of students engaged in the civil rights movement. The court rejected the idea that the speech at issue was of a"commercial" nature, noting that the advertisement "communicated information, expressed opinion, recited grievances, protested claimed abuses, and sought financial support on behalf of a movement whose existence and objectives are matters of the highest public interest and concern." New York Times, 376 U.S. at 266. The campaign advertisements at issue here were likewise directed to matters of the highest public interest and concern in Kentucky.

Life, Inc. v. Terry, 108 F.3d 637, 640 (6th Cir.) ("[T]he purpose of [Kentucky's campaign finance law] is to combat actual and perceived corruption in Kentucky politics by regulating contributions and expenditures in Kentucky public elections."), cert. denied, 118 S. Ct. 162 (1997). The Supreme Court has regularly recognized that the prevention of real and perceived corruption in the electoral process qualifies as a compelling state interest. See Buckley v. Valeo, 424 U.S. 1, 27, 67-68 (1974) (per curiam); see also Colorado Republican Fed. Campaign Comm. v. Federal Election Comm'n, 518 U.S. 604, 609 (1996) (recognizing a compelling governmental interest "in assuring the electoral system's legitimacy, [and] protecting it from the appearance and reality of corruption"); McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 356 (1995) (acknowledging Ohio's compelling interest "in avoiding the corruption that might result from campaign expenditures"); Federal Election Comm'n v. National Conservative Political Action Comm., 470 U.S. 480, 496-97 (1985) ("[P]reventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances."). What Kentucky seeks to circumscribe is the "subversion of the political process" where "[e]lected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns." National Conservative PAC, 470 U.S. at 497. As we have explained, "[c]orruption, either petty or massive, is a compelling state interest because it distorts both the concept of popular sovereignty and the theory of representative government." North Carolina Right to Life, Inc. v. Bartlett, 168 F.3d 705, 715 (4th Cir. 1999), petition for cert. filed, ___ U.S.L.W. ___ (U.S. May 18, 1999) (No. 98-1887).

Sadly, for Kentucky, the risk of corruption, both actual and perceived, is all too real. See supra Part I. Indeed, case reporters contain several examples that bear this out. See, e.g. , United States v. Collins, 78 F.3d 1021 (6th Cir. 1996) (affirming conviction of governor's husband for federal violations arising from gubernatorial fundraising activities); United States v. LeMaster, 54 F.3d 1224 (6th Cir. 1995) (affirming conviction of state senator for making false statements to the FBI during investigation of corruption in the Kentucky General Assembly); United States v. Blandford, 33 F.3d 685 (6th Cir. 1994) (same with respect to Kentucky's Speaker of the House). We think it is clear that Kentucky's interest in maintaining the integrity of its

19

electoral process and stemming actual or perceived corruption is compelling.

Furthermore, we conclude that the reporting requirement, in its amended form, is a narrowly tailored means of achieving this aim. To begin with, the statute implements the reporting requirement only for direct advocacy, not for issue advocacy where the state interest would be "less powerful." McIntyre, 514 U.S. at 356. In our view, § 121.180(11)(b) directly advances Kentucky's asserted state interest. As the Court explained at length in Buckley, disclosure and reporting requirements generally have the effect of "exposing large contributions and expenditures to the light of publicity" which, in turn, "discourage[s] those who would use money for improper purposes" and enables the voting public "to detect any post-election special favors that may be given in return" for campaign contributions. Buckley, 424 U.S. at 67. Reporting requirements, in particular,"are an essential means of gathering the data necessary to detect violations of [campaign finance laws]." Id. at 68. Under Kentucky's scheme, the requirement that the Broadcasters file a copy of their FCC report with the Registry functions as just such a means of identifying and detecting campaign finance infractions.

Moreover, we agree with Kentucky that the reporting requirement visits no real hardship on the Broadcasters. The Broadcasters assert that "the costs associated with the compilation and certification of [the required] reports" impose an onerous burden upon them, especially in light of the requirement that they sell political advertising at their lowest unit rate. These requirements, the Broadcasters contend, potentially chill speech because the only alternative for reducing these purported costs is for them to forego the sale of political advertising to Kentucky candidates altogether.

We find the Broadcasters' complaint that compliance forces them to absorb significant costs unpersuasive, particularly in light of the fact that the Broadcasters are already required by the FCC to compile the identical information Kentucky seeks. The statute requires that the Broadcasters merely "file with the registry a copy of the documentation of paid political campaign advertisements that is required to be maintained by the Federal Communications Commission, along with a cover letter from the manager of the station or network or the man-

20

ager's designee." Ky. Rev. Stat. § 121.180(11)(b). As far as we can see, the only additional trouble the Broadcasters are put to by the statute is that they must make a second copy of their FCC report and the station manager must draft a cover letter to accompany the additional report. The only added costs we can perceive are photocopying costs and postage. For the Broadcasters to characterize this relatively minimal imposition as burdensome strains our imagination. Indeed, they have not suggested that the FCC regulation referenced in the Kentucky statute is unconstitutionally burdensome. And, to the extent the Broadcasters bristle at the added costs imposed by the requirement that they sell advertising slots at the lowest unit rate, we simply note that it is a requirement of the FCC. We cannot agree that the statutory provision at issue, requiring the Broadcasters merely to file with the Registry a copy of their FCC report, impermissibly treads upon the First Amendment.

The requirement that the Broadcasters file a copy of their FCC report specifically advances the worthy goal of fostering honest elections by serving as a "cross-check" for determining whether the candidates are complying with the spending limits. In providing an additional method for Kentucky to monitor campaign spending compliance, the provision at issue advances Kentucky's interest in ferreting out campaign corruption and imposes only the slightest of inconveniences in doing so.

IV.

For the reasons set forth above, we conclude that the enforcement of Ky. Rev. Stat. § 121.180(11)(b) against the Broadcasters poses no problems under either the Due Process Clause or the First Amendment. Accordingly, we reverse the judgment below.

REVERSED

21